| 186 | 363 |
|-----|-----|
| 107a | 231 |
| 186 | 363 |
| 110a | 170 |
| 186 | 363 |
| 111a | 530 |
| 186 | 363 |
| 213 | 46 |
| 113a | 613 |

HENRY W. T. MALI *et al.*

*v.*

CARRIE A. SPENCER.

*Opinion filed June 21, 1900—Rehearing denied October 5, 1900.*

CREDITOR'S BILL—*when decree in creditor's bill proceeding cannot be sustained.* A decree in a creditor's bill proceeding directing the defendant to convey to a receiver property claimed by complainants to be held in trust for their debtor, who was the defendant's brother-in-law and business manager, cannot be sustained where the evidence shows that defendant alone furnished the money for the business, from the profits of which the property was purchased by her, that she employed her brother-in-law on a salary, and did not know that he was insolvent or even indebted.

MAGRUDER, J., dissenting.

*Spencer* v. *Mali,* 87 Ill. App. 680, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on writ of error to the Circuit Court of Cook county; the Hon. RICHARD S. TUTHILL, Judge, presiding.

NEWMAN, NORTHRUP & LEVINSON, for appellants.

REMY & MANN, for appellee.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Appellants, by their creditors' bill filed in the circuit court of Cook county against appellee and others, alleged that appellee held property in trust for their judgment debtor, George W. Powell, which ought to be applied to the payment of their judgment. The court heard the case on exceptions to a master's report in favor of appellants, and, after overruling the exceptions, entered a decree that appellee execute and deliver to a receiver a conveyance of all her right, title and interest in certain real estate in Cook county, and a bill of sale of all her right, title and interest in 1108 shares of stock of the Amazon Hosiery Company, in possession of the Merchants' National Bank of Chicago; that she deliver possession of the real estate to a receiver, and that the receiver advertise and sell said property for the satisfaction of appellants' judgment against said George W. Powell, and costs and expenses. Appellee sued out a writ of error from the Appellate Court for the First District, and that court reversed the decree. From the judgment of the Appellate Court appellants bring the case to this court.

The facts as proved by the evidence and found by the master and court are substantially as follows: In the year 1881 and prior thereto George W. Powell was in business at Valparaiso, Indiana, manufacturing and selling knitted garments, as a member of a firm which became indebted to complainants for merchandise. In 1882 that firm failed, and among its debts was the one of complainants on which they afterward obtained the judgment which is the basis of this suit. About December, 1882, Powell organized the Amazon Hosiery Company,

a corporation under the laws of this State, located at
Chicago, with a capital stock of $25,000, subscribing for
$10,500 of the stock, which was paid for from the assets
of the previous business.   He pledged this stock to a
bank at Valparaiso as collateral security for indebted-
ness to certain creditors of the firm.   He was made presi-
dent and manager of the corporation at a salary of $3800
per year, and was a director therein.   He carried on the
business of that corporation, as president and manager,
from that time, at Chicago, until 1896, when the plant
was moved to Muskegon, Michigan.   During this period
Charles G. Spencer, who had married the appellee, a
sister of Powell's wife, came to Chicago.   At that time
the Amazon Hosiery Company had bought machinery to
manufacture ladies' jersey ribbed underwear, but the
directors canceled the order and declined to go into that
branch of manufacture.   Charles G. Spencer was not in
business and Powell recommended that he go into that
kind of business, and on account of the relationship with
his wife agreed to aid him to get started.   Spencer took
up the business, under the name of "The Princess Knit-
ting Works," in the latter part of the year 1886 with his
own capital, but he proved a failure as a manager and
the business lost money.   In July, 1887, appellee was
separated from her husband and he transferred to her
the business of the knitting works and paid her $4000 in
cash, and she was afterward divorced from him.   She was
without any knowledge of business or business affairs
and Powell was experienced in that line.   She executed
a power of attorney to him, giving him full authority
to manage and carry on the business as he should deem
best.   The business turned over to appellee by her hus-
band amounted to from $3000 to $3700, and to this she
added the $4000 in cash from her husband, but no money
or property of Powell's ever went into the business.   He
managed the factory and business and Marshall Field &
Co. took the entire output until 1890.   After that there

were sales to other people, but they were in large quantities and to a few people, in a jobbing way. The customers were few, and there was no extended system of book-keeping. Powell's services took very little of his time, and for the first four or five years it did not exceed one hour a day except the time spent in selling the product, which was less than ten days in a year. He never devoted very much of his time to the business. He was managing the Amazon Hosiery Company on a salary of $3800 a year, and was president of the Protection Mutual Fire Insurance Company, from which he received, according to the master's report, $1200 per year. The evidence is that the salary paid by the insurance company differed in different years, and at one time was as high as $2400 a year. The business of the Princess Knitting Works was carried on by appellee under the name of C. A. Spencer & Co., but the firm was only nominal and she was the only one concerned in the business. She took no part in the business and never received anything but verbal reports from Powell as to its condition. After the year 1887 Powell received an annual salary from her of $1200. When he took hold of the business it was conducted in a small building on West Washington street. Soon afterward additional room was required, and in 1892 appellee bought ground through Powell and erected a factory on Belmont avenue at a cost of $30,000, which she afterward mortgaged for $20,000. The factory was paid for out of profits of the business. The next year she bought through Powell one hundred feet of real estate at Edgewater from the profits of the business at a cost of $6000, and a residence was erected on it at a cost of $12,000 to $15,000. This residence property has been mortgaged by her for $10,000. Out of the profits of the business the debt for which the original $10,500 of stock in the hosiery company was pledged by Powell was paid, and the stock taken up by appellee in her name and she became the owner of that stock. From the time that

Powell took charge of the knitting business he paid appellee $50 a month for expenses out of the business, and paid various of her bills.    After the residence was built, Powell and his family occupied the same with appellee, having the rent in lieu of salary.    The interest on the mortgage and repairs and taxes were paid out of the profits of the business, and they divided the household expenses.    The business of the knitting works was very profitable until about the year 1896, and in January, 1895, its assets were $176,000.    The year 1896 was a disastrous one for the Amazon Hosiery Company, and the knitting works made very little, if any, money in that year.    The Amazon Hosiery Company had moved its plant to Muskegon, Michigan.    Its stock was increased to $225,000, and appellee's business was consolidated with it by a transfer to it, and she received in payment stock in the hosiery company to the amount of $115,000.    She trusted Powell fully to manage the business and had general reports from him as to its condition, but no written statement.    There is no evidence that she knew anything about his indebtedness, or that the plan was merely a scheme devised to enable him to accumulate property which would not be subject to the claims of his creditors.

There have been several cases where wives have advanced money to insolvent husbands to enable them to engage in trade, where it has been held that money so advanced must be regarded as a loan to the husband, and that the wife cannot appropriate the entire fruits of his time, skill and industry as against his creditors.    (*Wortman* v. *Price*, 47 Ill. 22; *Wilson* v. *Loomis*, 55 id. 352; *Robinson* v. *Brems*, 90 id. 351.)    In such a case the wife, of course, knows of the indebtedness and of the insolvent condition of her husband, and the relation affords both motive and opportunity for conducting schemes to defraud creditors. The interest and relation of the parties in such cases may more readily give rise to an inference of fraudulent intent or justify a conclusion not allowable in the absence of

such a relation and interest. Even in the case of a wife, if the agency is actual and *bona fide*, and not an arrangement by which, under color of an agency, the husband enters into trade with cash furnished by her, the profits will not be subject to claims by creditors. A wife acting in good faith is not obliged to resort to strangers to transact her business, but may make her husband her agent without imperiling her property. (*Lachman* v. *Martin*, 139 Ill. 450; *Murphy* v. *Nilles*, 166 id. 99.) The circumstances of this case are widely different from those relied upon by appellants, where the capital advanced, and its increase, were subjected to the payment of the husband's debts. She was divorced from her husband, who had been the manager of the business, and this was all her capital and property, which she was utterly incapable of taking charge of or managing. She advanced nothing to Powell to enable him to start in business or to make a place for him, nominally in her name but actually in his own interests, and his time was largely given to his own business. He was experienced in the knitting business, was her brother-in-law and had advised her husband to commence the enterprise. It was most natural that she should retain his services,—in fact, it was the only thing she could do. It would be beyond belief that she employed him for his own benefit, or to enable him to engage in trade or accumulate profits exempt from the claims of his creditors. When the business proved successful and money was forthcoming for the wants of herself and child, she had especial reason to feel gratified that her small capital was making money for her, and it is not evidence of fraud that she was not particularly exacting in the matter of written accounts or reports.

It is insisted that the success of the business was entirely due to Powell, but the evidence does not justify that conclusion. He undoubtedly managed the business well, but the fact that scarcely any time or effort was required to make the sales shows that it was rather the

opening for a business of that kind which was fortunate, than anything else. The entire output of the factory was taken for several years by one firm and afterwards by only a few, and at a time when it was doing a business of from $250,000 to $300,000 per year. The profits were the legitimate outcome of the investment of appellee at an opportune time for that particular business. As we have said, it was undoubtedly well managed by Powell, but he was adequately paid for what he did. He had other business and was in the employ of two corporations from which he received salaries amounting to $5000 a year, and but a small part of his time was given to looking after this business. There is no evidence on which to base any claim that appellee knew Powell to be insolvent or even indebted. He had been carrying on the business of the Amazon Hosiery Company in Chicago for four or five years when she employed him. It was an apparently successful business, and, so far as appears, he was not harassed by creditors. If the rights of the parties are to be determined by the intention with which the contract was entered into, a fraudulent intent as against Powell's creditors was entirely lacking.

In the case of *Tripp* v. *Childs*, 14 Barb. 85, relied upon by appellants, the agreements between the son and his insolvent father were entered into for the purpose of protecting the earnings of the father from his creditors. The sole object was to secure and appropriate such earnings and to enable the father to escape the payment of his debts. The rules of that case do not apply to the facts of this.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*

Mr. JUSTICE MAGRUDER, dissenting.