WILLARD C. TORREY

*v.*

THEODORE G. DICKINSON *et al.*

*Opinion filed December 22, 1904.*

1. CREDITORS' BILLS—*clear proof is required to sustain conveyance from husband to wife.* Clear and satisfactory proof is required that a conveyance from husband to wife was made to place in her the legal title to the property of which she was the equitable owner, where the conveyance is without consideration and made just before the entry of a decree against the husband, for the acknowledged purpose of preventing the lien thereof from attaching to the property, which had stood in the husband's name for many years.

2. SAME—*when wife cannot claim property to the exclusion of husband's creditors.* A wife cannot, under the claim that her husband was acting as her agent, appropriate to herself, to the exclusion of the husband's creditors, the results of his time, labor and skill in manipulating real estate the legal title to which he has held for many years and of which he is the ostensible owner.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on writ of error to the Superior Court of Cook county; the Hon. AXEL CHYTRAUS, Judge, presiding.

PLINY B. SMITH, for plaintiff in error.

WILLIAM BENNETT MOORE, for defendants in error.

Mr. CHIEF JUSTICE RICKS delivered the opinion of the court:

On June 14, 1899, Willard C. Torrey, the plaintiff in error, obtained a decree in the superior court of Cook county against Theodore G. Dickinson, Edgar M. Snow and Henry H. Fuller, three of the defendants in error, for $9025 and costs of suit. The objections of Dickinson to an adverse report of the master in chancery in that case were overruled on May 20, 1899. On June 7, 1899, two quit-claim deeds

were filed for record, dated May 25, 1899, and acknowledged the same day, executed by said Dickinson to his wife, Mary B. Dickinson, one of the defendants in error, each conveying, for an expressed consideration of one dollar, several lots in the city of Chicago. The master's report was confirmed on June 14, 1899, and the decree was entered as above stated. Executions were issued to the sheriffs of Cook and LaSalle counties, which were returned, after demand made upon the defendants, wholly unsatisfied, no property being found. On February 10, 1900, plaintiff in error filed in said superior court his creditor's bill against the defendants in error, alleging that said Theodore G. Dickinson, on and prior to the date of said quit-claim deeds, was the owner in fee simple of the several lots described therein; that said deeds were made upon no consideration, for the purpose of placing said lots beyond the reach of an execution, and that they were fraudulent as to complainant. The bill also alleged that on December 19, 1893, the said Theodore G. Dickinson was the owner and held title of record to certain other lots in Chicago described in the bill, and on that day, by quit-claim deed, conveyed the same to David Campbell, who by quit-claim deed of the same date conveyed the premises to said defendant Mary B. Dickinson for the expressed consideration of $20,-000; that said conveyances were without actual consideration and made to hinder and delay complainant in the collection of the indebtedness to him, and that said Theodore G. Dickinson remained the beneficial owner of said lots. The bill further alleged that on October 26, 1895, said Theodore G. Dickinson was the owner of another lot in Chicago therein described, and on that day conveyed the same by warranty deed, for an expressed consideration of $5000, to Chester C. Barton; that on April 14, 1899, the said Chester C. Barton and wife conveyed the said lot to Mary B. Dickinson; that said two conveyances were merely colorable and without consideration and made to hinder and delay the complainant, and that Dickinson was still the beneficial owner of said lot.

The defendants Theodore G. Dickinson and Mary B. Dickinson, his wife, by their answers denied that any of said transfers were colorable or made with a fraudulent purpose, and alleged that all of said pieces of property were purchased with the money of the defendant Mary B. Dickinson; that the titles to the same were taken in the name of her husband, Theodore G. Dickinson, in trust for her, and that the subsequent conveyances to her were made for the purpose of placing in her the legal title to property of which she was already the equitable owner. The issues were referred to a master in chancery, who took the testimony and filed his report of the same, with his conclusions that no part of the funds of Theodore G. Dickinson was used in the purchase of said property; that all of it was purchased with the funds of the defendant Mary B. Dickinson, and that although the legal title was in him, she was all the time the equitable owner. He recommended a decree dismissing the bill for want of equity. Exceptions of the complainant to the report were overruled and a decree was entered dismissing the bill. On writ of error from the Appellate Court for the First District the decree was affirmed. The writ of error in this case was sued out by the plaintiff in error to review the judgment of the Appellate Court.

The material facts are as follows: The defendants Theodore G. Dickinson and Mary B. Dickinson were married in June, 1880. At different times after the marriage Mary B. Dickinson received from the estates of her father and brother sums of money aggregating $8000. She paid $1500 so received for a lot on Division street and in a couple of years sold the lot at an advance of $2500. With the proceeds of that sale and money so received from said estates she bought other property on Division street, and by encumbering it erected a row of apartment buildings, known as the Belleville flats. She rented the Belleville flats and held title thereto until November, 1899, when she exchanged that property for lots described in the bill of complaint, known as the North

Clark street property, which was encumbered for $12,000. The exchange was an even one, subject to the encumbrances on the respective properties, and the title to the North Clark street property was taken in the name of the husband, Theodore G. Dickinson. Both Mr. and Mrs. Dickinson testified that the title was taken in his name for the purpose of getting a larger mortgage on the property and because it was easier for a man to obtain a large loan than a woman. There were stores upon the front of the property, which were leased for $3600 per annum, and it was contended by the defendants, and Mr. and Mrs. Dickinson both testified, that this property, which was paid for with property of Mrs. Dickinson, was the beginning and source from which all the rest of the property involved in the litigation afterward grew. Mr. Dickinson was engaged in the real estate business from 1885 or 1886 to 1892, during all the time that the various pieces of property were acquired, first with Edgar M. Snow, and afterward with Snow and Henry H.. Fuller. From the time that said deed was made to Mr. Dickinson he assumed the entire control and management of the property thereby conveyed and of all the property subsequently acquired. He managed the property in every respect as his own, except that he and his wife both testified that he advised with her as to what was best to be done. The firm in which Mr. Dickinson was a partner secured options on various pieces of property under agreements by which such property was subdivided and the title conveyed to Fuller, one of the partners, who executed separate notes and mortgages on each lot and conveyed the lots to purchasers subject to the mortgages. If they were able to dispose of the lots in that way they availed themselves of the option and received the difference between the sales and the option price as their profit. All the other property involved in the suit was obtained in carrying out these option deals. The first of these transactions was in September, 1890, when the title to a lot numbered 14 was conveyed to Mr. Dickinson and it was subsequently divided

into a number of lots. He testified that the lot was purchased by him for his wife, subject to a mortgage of $6000; that he paid $2300 in cash of her money for the lot; that she had had the income from the North Clark street property at the rate of $3600 per annum for ten months and had collected rents previously for the Belleville flats. This property was on Prairie avenue and it stood vacant for a number of years, when money was borrowed with which the previous encumbrance was paid and eight small houses were erected. Mr. Dickinson signed the papers, had charge of the erection of the buildings and the contracts were made by him. For several years Mr. and Mrs. Dickinson lived in one of these houses and she collected rents for a time, but afterwards that business was placed in the hands of a real estate firm. There are separate mortgages on these lots. One of them was sold by Dickinson to Chester C. Barton in 1895 and was conveyed to him. He held the title until April, 1899, when, being unable to meet the payments, he conveyed the lot to Mrs. Dickinson.

The next transaction related to the State street and Cloud court property, which property was acquired in June or July, 1891, from one of the options, by which the firm could take property at an advanced price and upon finding purchasers had the excess above the option price for their own profit. This property was on State street and Cloud court and included with other property in the option, and the title was taken by Mr. Dickinson. It was vacant property and was all subject to a mortgage of $26,000, and $3900 cash was paid for the equity. Mr. and Mrs. Dickinson both testified that this property was bought exclusively with the money of Mrs. Dickinson and the title taken in the name of Dickinson in trust for Mrs. Dickinson. Not long after the purchase Mr. Dickinson made a lease to the property for ninety-nine years, with a condition that the lessee should construct a building upon it of the value of $40,000 and that the lessor would advance $18,000 for use in the building, the money thus

advanced to be returned by an increase in the scale of rents. The building was constructed and after two or three years the lease was forfeited. During the time it was held under that lease the evidence discloses that the rents were collected by Mrs. Dickinson. In order to procure the $18,000 to be advanced toward the building, a loan of $40,000 was obtained upon this property in November, 1892, and with that loan the mortgage debt previously existing against the property was paid off, and the balance, with additional funds furnished by Mrs. Dickinson, was used in the $18,000 advancement to the tenant who was constructing the building. This $40,000 mortgage remained on this property until a judgment for $20,000 was obtained against Mr. Dickinson and his partner in 1893, which Mr. Dickinson had to pay. In order to pay that judgment $90,000 was borrowed upon what is termed the State street and Cloud court property, the Sixty-third street property and the Clark street property. When this judgment was obtained Mrs. Dickinson claims to have become apprehensive about leaving her property in her husband's name, and on the 19th of December, 1893, the Sixty-third street property was conveyed to her, and on the 23d of December, 1893, the property now under consideration was conveyed to David G. Campbell by Mr. and Mrs. Dickinson, and by Campbell on the same day re-conveyed to Mrs. Dickinson, and she has held and controlled that property and received the rents from that time.

In the fall of 1891 a piece of property on Sixty-third street, which was included in another of the firm's option deals, was purchased and conveyed to Mr. Dickinson. It was one hundred and twenty-five feet square, comprising five lots. The property in that option was sold out, so that the firm made a profit of $5000 in the whole deal. Mr. Dickinson testified that in order to close the transaction, his partner, Fuller, retained these lots without the payment of any cash, subject to the encumbrance, and that he bought them afterward from Fuller for $10,000 or $11,000 in cash, which he paid

with his wife's money. Fuller testified that the encumbrance was pretty near the amount the corner stood for in the option deal; that there was some balance, but he could not say how much, and according to his recollection he and Dickinson took them in closing the transaction and applied a balance of the profits from the sale of the other property as a cash payment. Snow, the other partner, testified that the cash payment was made out of the profits of the business of the firm. The property was vacant when purchased but it is now covered by buildings constructed by Mr. Dickinson. Subsequently this property was mortgaged with the State street and North Clark street property, and with the proceeds the other encumbrances were paid and the judgment against Mr. Dickinson for $20,000 was settled. The State street property and Sixty-third street property are the ones which were conveyed to Campbell on December 19 and 23, 1893, and which Campbell conveyed to Mrs. Dickinson. A judgment had been obtained against Mr. Dickinson which was a lien on the property, and Mrs. Dickinson testified that the property was conveyed to her through Campbell to prevent further liens on her property which she would be compelled to pay.

In February, 1892, another loan of $5000 was obtained on the North Clark street property, and with this money, or the rents, or both, Mr. Dickinson erected flats upon the rear of said property. He testified that these flats on the rear of the North Clark street property were erected with moneys which came either from revenues or from mortgages, but he was unable to state which. All of said property except that on Sixty-third street and the Barton lot was conveyed to Mrs. Dickinson by the quit-claim deeds just before the decree against Mr. Dickinson was entered. The value of the property in Dickinson's name at the time of the conveyance to his wife is not shown, the master not permitting evidence on that subject to be given. It appears, however, that the aggregate amount of loans secured upon the property is about $150,000, and on the usual basis of loans of money the property is of

great value. The property was all acquired between November, 1889, and the year 1892. Mr. Dickinson was engaged in the real estate business during this time, and the evidence shows that the net income of his firm for the year 1889 was $50,000, for 1890 $100,000 and for 1891 $47,000, of which he was entitled to nine-sixteenths, his net income from that business being about $28,000 in 1889, $56,000 in 1890 and $26,000 in 1891. The rentals of the pieces of property went into the hands of the firm and payments on the investments were made with their checks. Certain books of the firm were produced, but they contained no account showing the facts. Mr. Dickinson testified that the accounts were not kept in the name of his wife but in the names of the different properties; that he had looked for other books of the firm but did not find them; that there were memorandum books in which items were set down, but not all of them; that he did not know where the books were and had not searched for them; that his wife kept a bank account at different times with different banks which he named; that there were no books kept which would show whether the buildings were the proceeds of the rents or income except the memorandum books, and that all the funds his firm collected from Mrs. Dickinson's property were put in the firm's bank account and checked out on her order. Mrs. Dickinson testified that she kept no bank account, but saved her income and her husband took charge of it; that it was all received by him and taken care of by him for her, and she could not tell whether it went into his bank account or not.

The quit-claim deeds made just before the entry of the decree against Mr. Dickinson were without consideration, and he and his wife agreed in testifying that they were made for the purpose of preventing a possible decree or judgment against him becoming a lien on the property. He held the legal title and had held it for many years. He had dealt with the property as his own, leased it, erected buildings on it and mortgaged it and executed the notes secured by the mort-

gage. To all appearances he was the legal owner and the conveyances were *prima facie* fraudulent. It devolved upon the defendants to prove that Mrs. Dickinson was the real owner of the property, that the alleged secret trust existed, and that the conveyances, confessedly made to prevent the collection of a possible judgment, were merely made to place in her the legal title to property of which she was already the equitable owner. The transactions were between husband and wife, where the greatest opportunities for fraud exist, and such transactions are to be closely scrutinized. Clear and satisfactory proof was required to establish the fact that property so held, managed and controlled by the husband was in fact the property of his wife. The evidence and explanation as to the North Clark street property were of that character, but as to subsequent transactions the evidence was both general and indefinite. It is not in the common experience that a moderate sum of money should develop in a few years into so much property and of so great value.

In considering the testimony of Mr. and Mrs. Dickinson it can make no difference that she was called as a witness by complainant. She was an adverse witness, and was not any the less testifying in her own interest or less influenced by such interest because she was called and examined by complainant. Her explanation of the reason for the conveyance to her of the Sixty-third street property on December 19, 1893, and the State street property on December 23, 1893, does not seem to be the correct one, for the reason that at the same time Mr. Dickinson held the title to all the other property which she now claims belongs to her and a judgment would be an apparent lien upon it. She testified that that property was conveyed to her to prevent further liens on her property which she would be compelled to pay. If that had been the reason, it seems that the rest of the property would also have been conveyed to her unless at the time she did not consider herself the owner of it. It does not appear, however, that the conveyance of those properties impaired the

ability of Mr. Dickinson to pay his debts. The indebtedness on which complainant's decree was based accrued from 1892 to 1894, but apparently he still had property sufficient to meet all his obligations. At any rate there is no evidence to the contrary. The evidence would not justify a conclusion that the conveyances in 1893, if regarded as voluntary, were fraudulent as against the complainant. Except as to the Sixty-third street property and the North Clark street property, and the State street property, we think the decree was wrong.

Mrs. Dickinson testified, in a general way, that as she understood it the property was all bought with her funds, but she knew practically nothing about any of the transactions. She testified that the property was taken in trust by her husband, and that it was paid for, as she understood, in some way with her money or with income from rents and mortgages on her property, and that the title was placed in her husband so that it could be handled better and larger mortgages could be made. She testified that her husband dealt in tax titles for her and made money for her in that way, but she did not know how much; that he bought tax titles and handled the business and that she left everything to his care; that she did not know how much money she had at the time any of the purchases were made; that she did not know the amount paid for any piece of property, the cost of any improvement, the amount of rents, or the taxes, assessments or carrying charges against the property. She said that her husband received her money and took care of it, telling her from time to time the amount she had; that she did not know whether money of her husband or any of the profits of his firm went into any of the property or not, and that all she knew was that the property was bought and improved from amounts saved from her income and raised by mortgages on her property.

A married woman may make her husband her agent for the management of her property, and he may perform ordinary and reasonable services for her without compensation

without subjecting her property to the claim of his creditors. (*Mali* v. *Spencer,* 186 Ill. 363.) If this agency is actual and *bona fide,* he may lease her property, collect rents or invest her money or change her investments by her authority without subjecting the property to his debts. On the other hand, she cannot, under the guise of an agency, appropriate to herself the results of the time, labor and skill of her husband to the exclusion of his creditors. (*Wortman* v. *Price,* 47 Ill. 22.) Manifestly, whether the whole of the husband's time is so devoted, or a substantial part of it, is not decisive of the question, if the increase, growth or profits are the result of his skill, labor and industry. It is beyond doubt that the unusual accumulation of property in this case from small beginnings was to a large extent the result of the skill, experience and diligence of Mr. Dickinson during the years in which the property stood in his name and while he managed it ostensibly as his own, even if he did not put any of his own money into it. He did not confine himself to acting as the agent of his wife or under her authority, but transacted all the business as if acting for himself, seeking new investments and making them, while she had no knowledge of what is now alleged to be her own business, except in the most general and indefinite way. His business experience, knowledge of real estate and management of the business, with the opportunities afforded him through his firm, contributed a material part of the increase and growth of the property, if not the greater part of it. During the time the property was acquired he was in receipt of a very large income, and his subsequent insolvency is wholly unexplained. The clear and satisfactory proof required of the defendants was not made. If any books were kept showing the transactions and the sources from which the property came, and that none of his money went into the property, they were not produced and neither was any bank account shown. Mr. Dickinson, in his testimony, said nothing about the tax title business which his wife said he carried on for her and with her money. He

testified that when he took the title to property he made out a little slip of paper showing that his wife was the owner of the property, which he either gave to his wife or put with the deeds. Mrs. Dickinson testified that she did not know of any such writing, and none was found.

Our conclusion is that the conveyances of property to Mrs. Dickinson, except the North Clark street property, the State street and Cloud court property and the Sixty-third street property, are fraudulent as against the rights of the complainant, and should be set aside and the property subjected to the payment of the decree in favor of complainant.

The judgment of the Appellate Court and the decree of the superior court are therefore reversed and the cause is remanded to the superior court, with directions to enter a decree in accordance with the views herein expressed.

*Reversed and remanded, with directions.*