(No. 23975.—

MINNIE OSBORN, Appellee, *vs.* CHARLES H. ALBERS, Receiver, Appellant.

*Opinion filed February 18, 1937—Rehearing denied April 13, 1937.*

WIRT HERRICK, and O. R. MIDDLETON, for appellant.

632

KENNEDY & KENNEDY, and FRANK LINDLEY, for appellee.

Mr. JUSTICE FARTHING delivered the opinion of the court:

The Appellate Court for the Third District issued a certificate of importance after affirming the judgment of the county court of Ford county in favor of appellee, Minnie Osborn, in a jury trial of the right of property.

The facts leading up to this were, that on November 24, 1933, the receiver of the Gibson City State Bank, obtained judgment for $2868.54, and costs, by confession on a promissory note given the bank by William A. Osborn, appellee's husband. The sheriff served the execution issued thereon and also levied on the stock of a seed store, the property here in question, on March 25, 1935. The next day Minnie Osborn caused a notice of claim of ownership to the property levied upon, to be served on the sheriff. The cause was tried on April 11, 1935, and the jury returned a verdict finding the property belonged to Minnie Osborn. A motion for a new trial was overruled and judgment was rendered on the verdict.

Minnie Osborn and William A. Osborn were married on June 12, 1929. She had property of her own at that time. Her husband conducted a seed business at Gibson City from 1920 to February 1, 1933. The Gibson City State Bank was closed by the Auditor of Public Accounts in December, 1932. Osborn admitted that he was indebted to it on February 1, 1933, and that it held his notes. When the bank closed $540.54, the balance of his account, was credited on his indebtedness. Appellee claimed that she loaned her husband $5000, on March 10, 1931, and that $2500 of that amount was evidenced by a promissory note. The Osborns both testified that he sold her his seed business on February 1, 1933, and that she credited the $2500 note with $555, the value of the seed then on hand in the

store. None of this seed remained unsold at the date of the levy. Appellee and her husband testified that he managed the business for her from February 1, 1933; that she agreed to pay him $50 a month for his services and that she supported him and paid his incidental expenses together with the taxes on his residence. With the exception of one month, the $50 a month was credited on the $2500 note each month, after the sale of the business.

Appellee had two bank accounts, one in a Bloomington bank and the other in the First National Bank of Gibson City. Her pass book, at the latter bank alone, was introduced in evidence and showed deposits totalling over ten thousand dollars between March 16, 1934, and March 19, 1935. Ninety-two checks were introduced in evidence which, with few exceptions, were signed by both the husband and wife. A few checks were signed by the wife, alone. None were signed Minnie Osborn by William A. Osborn. A few of these checks were on the Bloomington bank.

On March 3, 1934, the husband and wife executed an agreement. It recited that Minnie Osborn had been conducting the seed business from February 1, 1933; that William A. Osborn had acted as manager thereof; that he had given her notes for $5000 borrowed from her; that he was to receive $50 per month from February 1, 1933, so long as he remained manager and that she was to credit that sum on his notes at the close of each month.

The remaining witnesses for appellee, with the exception of Eugene Funk, a wholesale seed dealer of Bloomington, testified that Osborn told them that he was working for his wife in managing the business. From this they testified she was the owner. Funk testified that the account was carried in the name of Minnie Osborn from about the time the Gibson City State Bank closed. Checks given in payment for purchases of seed at this store were shown to have been made payable, for the most part, to W. A. Osborn. Appellee admitted that some money was made in

the seed business but there was no showing of just what the profits were. She received various sums from the sale of shares of stock in Swift and Company and Armour and Company, as well as from the sale of a piece of real estate. It is also shown by her testimony and that of her husband that the latter was insolvent.

The appellant's first contention is that the transfer of the seed business to the husband and his management thereof, under the circumstances detailed, amounts to fraud in law, under our holding in *Wilson* v. *Loomis*, 55 Ill. 352. In that case, Mrs. Rosette Roe purchased a lumber business with her individual money. For a time she was in partnership with one Howell. Later she bought him out and her husband managed the business as "agent." The property there in question was sold to Loomis, at which time the sheriff had in his hands an execution against C. S. Roe, the husband. He levied on the property and Loomis sued to re-possess it. There was no transfer from husband to wife and there is no mention of any indebtedness between them or of any salary having been paid to the husband. We held that if a wife engages in general trade with her own money and her husband contributes his labor, skill and ingenuity and increases the business, the original capital and increase are liable for his debts and are not exempt as the property of the wife. In discussing this holding in our decision in *Mali* v. *Spencer*, 186 Ill. 363, at page 367, we said: "There have been several cases where wives have advanced money to insolvent husbands to enable them to engage in trade, where it has been held that money so advanced must be regarded as a loan to the husband, and that the wife can not appropriate the entire fruits of his time, skill and industry as against his creditors. (*Wortman* v. *Price*, 47 Ill. 22; *Wilson* v. *Loomis*, 55 id. 352; *Robinson* v. *Brems*, 90 id. 351.) In such a case the wife, of course, knows of the indebtedness and of the insolvent condition of her husband, and the relation affords both motive and opportunity for

conducting schemes to defraud creditors. The interest and relation of the parties in such cases may more readily give rise to an inference of fraudulent intent or justify a conclusion not allowable in the absence of such a relation and interest. Even in the case of a wife, if the agency is actual and *bona fide,* and not an arrangement by which, under color of an agency, the husband enters into trade with cash furnished by her, the profits will not be subject to claims by creditors. A wife acting in good faith is not obliged to resort to strangers to transact her business, but may make her husband her agent without imperiling her property.— *Lachman* v. *Martin,* 139 Ill. 450; *Murphy* v. *Nilles,* 166 id. 99."

In the *Mali case* the manager of the business was not a husband but a brother-in-law. But in *Alsdurf* v. *Williams,* 196 Ill. 244, the wife owned a farm and her husband did the work and created the increase and profits in question. The principles just stated were applied in this case and at page 248 we said: "A husband cannot rightfully carry on his business in his wife's name under an assumed agency. He cannot use his wife's name as a mere device to cover up his property or keep from his creditors the profits of a business which is, in fact, his. A wife can not hold the property of her husband to delay, hinder or defraud his creditors. (*Robinson* v. *Brems,* 90 Ill. 351; *Lachman* v. *Martin,* 139 id. 450.) But if the property belongs to the wife it cannot be taken for the debts of the husband, and all the increase and legitimate outgrowth of the investment are as absolutely hers as the original capital. If a wife owns a farm she is not required to exclude her husband from it and employ strangers exclusively, at the risk of losing her property. Where a husband and wife live together on a farm and he contributes personal labor only, such as is consistent with the common interest and the proper enjoyment of the property, the products will not belong to him or be liable for his debts. (*Primmer* v. *Cla-*

*baugh,* 78 Ill. 94; *Bongard* v. *Core,* 82 id. 19; *Bennett* v. *Stout,* 98 id. 47.) Each case must be determined from its own facts and circumstances. If it appears that the wife has purchased property with money obtained from a source other than her husband, she will be protected in its possession and ownership. * * * By the statute, neither husband nor wife is entitled to recover any compensation for any labor performed or services rendered for the other, whether in the management of property or otherwise. (Hurd's Stat. 1899, chap. 68, sec. 8, p. 959.) If, however, a conveyance appears to be fraudulent and the husband is the real owner, or if an investment is for his benefit to enable him to carry on his business and to realize the profits of his skill and industry, it will be liable for his debts."

The case of *Blood* v. *Barnes,* 79 Ill. 437, involved the replevin, by a wife, of printing presses and type from a constable who had levied execution on her property, used by her husband in a printing business. We reviewed *Wortman* v. *Price,* 47 Ill. 22, *Brownell* v. *Dixon,* 37 id. 197, *Wilson* v. *Loomis,* 55 id. 352, and *Elijah* v. *Taylor,* 37 id. 247, and at page 439 we said: "In the former case, [*Wortman* v. *Price,*] the wife had placed money in the hands of her husband, to be used by him in trade, and it was held as a loan of money to him, and his stock in trade would be liable for his debts." We then held that the *Blood case* was similar to *Dean* v. *Bailey,* 50 Ill. 481, and that there was as much propriety in the wife investing her money in printing machinery and type to be used by her husband in printing, as there was in the *Dean case* in investing in a farm, stock and farm implements to be used by the husband, who was a farmer. We said that this was the best way to provide for the wife's family and that in so doing her property was not subject to the husband's debts.

The decisions on the question as to whether a husband may donate his services to his wife in conducting a business

established and maintained with her separate funds, without subjecting her property to his debts, are collected in 28 A. L. R., 1046. In most States it is held that such an arrangement is not fraudulent as a matter of law. Where a contrary result was reached, in a few cases the basis of the decision was similar to that in *Wilson* v. *Loomis, supra,* but in most of these cases the facts showed either subterfuge, or a scheme to conceal the husband's assets from his creditors. The better rule is, that the question of fraud is one of fact to be determined in each case, but, because of the opportunity for fraud and connivance, such an arrangement between husbands and wives will be closely scrutinized. However, we cannot say that there was no evidence here to support the verdict. The appellant's contention that there was no evidence that the arrangement between Mrs. Osborn and her husband was made in good faith, and that it amounted to a fraud in law, must be overruled.

There are several contentions made by appellant as to the admission and rejection of testimony. One objection was to testimony of Osborn that he had invested $44,000 in stock of the Gibson City State Bank in 1925. The appellant is correct in the contention that this transaction was too remote, that the testimony was irrelevant and that it tended to prejudice the jury against the receiver. The appellee contends that she had a right to show that her husband was insolvent. Assuming that she did, she had no right to show transactions over a period of years involving the loss of his money.

Error was committed in permitting appellee to introduce copies of self-serving occupational tax returns to the Auditor of Public Accounts. Appellee says tax receipts are admissible in evidence to show ownership and possession, but these exhibits were not receipts and they were not even shown to have been true and correct copies. This error was aggravated by the statement volunteered by ap-

pellee's counsel, "It is binding upon the auditor of the State," when objection was made to these exhibits.

Objections were sustained to the cross-examination of appellee when she was asked if she had complied with the Bulk Sales act and the requirements of the Husband and Wife statute, as to transfers of personal property between them. It was stipulated that all the seed on hand in the store on February 1, 1933, had been sold before a levy was made under the execution involved in this suit, but proof of compliance with the two statutes mentioned was material to show good faith on the part of the Osborns in this transfer. The appellant had a right to cross-examine appellee on this matter and it was error to deny that right.

Appellant contends that the testimony of appellee and her husband to the effect that he was employed by her as manager of the seed business was inadmissible because it was a conclusion. Other proof, not objected to, covered practically the same ground—for example, the written agreement made a year or more after the supposed sale of the business. Although these statements were conclusions, the error would not be sufficiently grave to justify a reversal of the judgment on this ground alone. Neither would the fact that W. A. Osborn was permitted to state that appellee employed certain other persons, which was his conclusion as to the matter, instead of stating the facts out of which the employment arose. Objections should have been sustained to the testimony of witnesses as to Minnie Osborn's ownership, whenever it appeared that their knowledge on the subject of ownership came from statements made by W. A. Osborn. No objection was made to such testimony by some of appellee's witnesses. This error, standing alone, would not be enough to warrant reversing the judgment, but this case must be tried again and it may be well to point out that neither conclusions, nor hearsay testimony, as to employment in, or ownership of, the business should be admitted in evidence.

We have already condemned the statement of appellee's counsel with reference to the Auditor of Public Accounts being bound by the copies of occupational tax returns. Appellant is correct in his contention that such remarks as follows are prejudicial: "It [appellant's defense] is just a dose of something with a dark brown taste that originated in the perverted mind of O. R. Middleton;" "Lets analyze this evidence in this case and see whether everybody is lying but Middleton;" "he is a very brilliant lawyer because he gets the date right within one year of the truth;" "if they would take that much from this brilliant lawyer from Gibson City or myself I believe it would jar us financially;" "I haven't time to fool around with Middleton;" and "O. R. Middleton couldn't quote the law to you correctly on a bet." When counsel for appellant objected to a question asked by counsel for appellee, the latter interrupted the objection and added contemptuously, "and a conclusion." At other times during the course of the trial counsel for appellant were sarcastically referred to as "brilliant" and as being "a genius." At other times counsel were called "not intelligent" and were accused of "fourflushing" when they objected to counsel for appellee reading a note to the jury before it had been offered in evidence.

Appellant is correct in his contention that it was error to require him to state what his defense was, at the beginning of the case. Since the trial of the right of property is statutory and the statute states that there shall be no written pleadings but makes no requirement calling for such a statement, the action of the court was improper.

We do not deem it necessary to consider any additional assignments of error contained in the unusually long briefs.

For the reasons indicated the judgments of the Appellate Court for the Third District, and of the county court of Ford county, are reversed, and the cause is remanded to the latter court for a new trial.

*Reversed and remanded.*