CENTRAL PRODUCTION CREDIT ASSOCIATION, f/k/a Northwest Production Credit Association, Plaintiff-Appellant and Cross-Appellee, v. ELMER HANS *et al.*, Defendants (Julie Lindstrom, Defendant-Appellee and Cross-Appellant).

Second District   No. 2—88—1113

Opinion filed October 19, 1989.

James G. Madden, of Madden & Sisler, of Freeport, and Early, Collison, Tousey, Regan & Farrell, of Elgin (Stephen D. Tousey, of counsel), for appellant.

H. Heller & Associates, of Naperville (H. Kent Heller, of counsel), for appellee.

JUSTICE McLAREN delivered the opinion of the court:

Plaintiff, Central Production Credit Association (CPCA), appeals from the trial court's denial of its motion for judgment *n.o.v.* or, in the alternative, for a new trial on count I of its complaint and the court's entry of a directed verdict for $18,512 in favor of CPCA on count II. Defendant Julie Lindstrom (Lindstrom) filed a cross-appeal claiming the court erred by finding that the action was not barred, in granting a new trial, and in denying her motion for fees pursuant to

section 2—611 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—611). We affirm in part, reverse in part, and remand.

Elmer Hans, a farmer, along with his two sons Ronald and Terry, produced crops on various lands either owned or leased by the three men. In 1982, Elmer completely removed himself from the operations of the farms. The day-to-day activities were handled by Ronald and Terry. Elmer also had a daughter, Lindstrom, who was not engaged in the farming operations.

In 1979 and 1980, Ronald, Terry and Elmer Hans together with their respective wives executed certain notes with plaintiff's predecessor in interest. In 1980, the total amount outstanding under these notes was $550,000. These notes were consolidated, and the Hanses agreed to pay $110,000 per year plus accrued interest until the total amount outstanding was paid off. The installments were due on April 1 of each year, and the payments were timely made in 1981 and 1982.

On April 1, 1983, the Hanses were only able to pay $50,000 of their 1983 obligation under the consolidation agreement. Also in 1983, the Hanses were participating in the United States government's payment-in-kind (PIK) program. Participants in this program agreed to leave a certain number of acres unfarmed and in return received corn which the government had stored from previous surplusage. This corn could then be sold and the proceeds kept by the participant. CPCA agreed to extend the time for payment of the $60,000 balance due until December 1983, the time at which the PIK corn could be sold.

It is apparent that the Hanses became concerned about the possibility that they would lose the farm. According to an affidavit of Evelyn Prins, Terry Hans' former wife, the Hanses met with advisors in September or October 1983. These advisors presented a scheme in which the Hanses would dispose of certain assets and execute certain notes in favor of Lindstrom in an attempt to place these assets outside the reach of creditors. Additionally, the Hanses would attempt to give sufficient cash to Lindstrom to keep the farm operational. They would also invest any additional cash they had in commodities so when the farm was foreclosed upon they would be in a position to redeem it. According to the Hanses, the meetings with the advisor, Bennett Little, were to obtain advice pertaining to estate planning and commodity investing.

In October and November 1983, Ronald and Terry Hans sold their 1983 corn crop. These transactions involved the corn that was actually produced by Ronald and Terry and not the corn received pursuant to the PIK program. The proceeds from these sales, $107,073.42, were deposited into an account maintained at Blunt, Ellis & Loewi,

Inc. (BE&L). This account appears to be three accounts in one: a cash account, a money market account, and a commodities account. While there was only one account number assigned to this account, the account statement reflected activity in all three accounts.

Also, in November 1983, Ronald and Terry executed a demand promissory note in the amount of $250,000 made payable to Lindstrom. The note listed the account maintained with BE&L as "security for repayment." In consideration for the note, Lindstrom gave Ronald and Terry "all of her rights to any estate that she may later inherit from her father or that she previously inherited from her mother." The record is scant as to how these rights were valued at $250,000. Also, in November and continuing through February 1984, and on the advice of Bennett Little, Ronald and Terry purchased cattle commodities through BE&L. These commodities were purchased with monies in the BE&L account.

When the $60,000 balance on the 1983 installment payment became due in December 1983, Ronald and Terry requested an extension. Ronald and Terry, "for tax reasons," did not want to sell the PIK corn until January 1984. CPCA acquiesced in this request. However, the PIK corn was not sold in January 1984. The Hans brothers thought that the price of corn would increase so they held on to the PIK corn.

On February 28, 1984, the PIK corn remained unsold. Mike Anderson of CPCA met with Terry Hans. Anderson noted that the $60,000 balance due on the 1983 installment was overdue. This balance was supposed to have been paid in January 1984 out of the proceeds of the sale of the PIK corn. Additionally, Anderson noted that the $110,000 installment for 1984 was due on April 1. Anderson informed Terry that CPCA would initiate collection action on the entire balance of the loan if both payments were not made.

On March 1, Lindstrom demanded payment on the $250,000 note executed by Ronald and Terry. On March 6, Lindstrom quitclaimed her real estate interest in the Hans farm properties to Ronald and Terry. Additionally, Lindstrom assigned any interest she had in the Hans farming operation to Ronald and Terry. The record is silent as to what the value of these interests was.

On March 12, Ronald and Terry filed documents with the Agriculture Stabilization and Conservation Service (ASCS) of the United States Department of Agriculture, indicating that they were splitting the crops on all lands farmed in 1984 on a 50/50 basis.

On March 13, Anderson met with Ronald and Terry and again requested that the PIK corn be sold and the proceeds turned over to

CPCA to satisfy the balance due from 1983. Anderson also reaffirmed that the $110,000 installment for 1984 was expected to be received on time. The payments were not made, and on April 2, Anderson and Randy Peterson of CPCA met with Ronald and Terry. Payment of the $60,000 balance on the 1983 installment and the $110,000 installment for 1984 were demanded. Ronald and Terry informed the CPCA representatives that they could not pay the $110,000 1984 installment. They asked CPCA to wait until the 1984 crop was sold for payment. Additionally, Ronald and Terry stated that, instead of paying the $60,000 balance due from 1983, they wanted to use the proceeds from the sale of the PIK corn to plant the 1984 crop.

Also in March, the commodities purchased by Ronald and Terry through BE&L were sold, and the proceeds were transferred from the BE&L commodities account into the BE&L cash account. On April 2, Ronald and Terry paid Lindstrom $203,996.27 pursuant to her March 1 demand for payment of the note. This payment was made out of the BE&L account.

Sometime in April, Lindstrom leased approximately 160 acres of land from Robert Helm and Howard Johnson for $11,000 per year. This land had been leased and farmed by Ronald and Terry in prior years. It was at Ronald's request that the landlords leased the land to Lindstrom instead of him and Terry. The lease documents are dated March 1, 1984, but Lindstrom testified that they were not executed until after April 1.

On April 23, Anderson and two other representatives from CPCA met with Ronald and Elmer. The Hanses requested that they be allowed to retain the proceeds from the sale of the PIK corn. Additionally, they requested that CPCA grant an extension on the $110,000 1984 installment. Ronald informed the CPCA representatives that they were intending to farm the same number of acres in 1984 as they did in 1983. CPCA proposed that the Hanses sell the PIK corn and pay off the balance due on the 1983 installment. CPCA also offered to wait until the fall of 1984 for the 1984 installment if Ronald and Terry would assign their interest in 120 acres of land they were purchasing on contract from Elmer and his sister as additional collateral. CPCA would also loan the Hanses an additional $35,000 to facilitate the 1984 planting.

On April 27, Elmer deeded his home to Lindstrom, subject to a life estate in Elmer. As consideration for this transfer, Lindstrom paid off the outstanding mortgage balance of $20,905.92. This property was valued at $75,000 by the Hanses.

Anderson testified that on April 30, Ronald phoned Anderson and

informed him that Ronald and Terry were not willing to assign their interest in the 120 acres as CPCA had requested. Ronald testified that he did not refuse to give the assignment. Instead, CPCA withdrew its offer before the Hanses could respond. On May 1, representatives of CPCA again met with Ronald and Terry. CPCA was presented with a financial statement dated May 1, 1984, and signed by Elmer, Ronald and Terry. The statement made no reference to the balance due Lindstrom by Ronald and Terry pursuant to the demand note. Ronald and Terry again refused to assign their interest in the 120 acres as additional collateral. Also, by this time, Ronald and Terry had prepared most of the acreage that was going to be farmed in 1984 for planting, and they had possession of the seed.

On May 2, a number of transactions between Lindstrom and the Hanses were executed. Elmer leased 400 acres to Lindstrom for $20,000 per year. Elmer testified that the lease was incorrect and it was actually 480 acres that were leased. This same acreage had been leased to Ronald and Terry for $50,000 to $60,000 per year in prior years. Additionally, Lindstrom only paid $10,000 of the rent, and the other $10,000 was forgiven.

Ronald and Terry assigned their interest in an installment contract for deed for 120 acres they were purchasing from Elmer and his sister to Lindstrom. The contract was originally entered into by William Hans, Elmer's late father. The contract provided for payments of $1,000 per year until the purchase price of $144,000 was satisfied. William's rights under the contract had been devised to Elmer and his sister. At the time of the assignment to Lindstrom, the outstanding balance on the contract was $131,000. In consideration for their rights under the contract, Lindstrom agreed to make all payments and abide by all terms, conditions and stipulations of the contract. No other consideration was given or requested. This land was listed as having a value of $320,000 on the financial statement dated May 1. As a result of this assignment, Lindstrom became the contract purchaser of the 120 acres.

Elmer also deeded to Lindstrom his one-half undivided interest in the 120 acres being sold to Ronald and Terry under the above-mentioned contract. Lindstrom paid $30,000 to Elmer for his interest as a contract seller. As a result of this transaction, Lindstrom became a contract seller of land in which she was also the contract purchaser pursuant to the above assignment.

Lindstrom also leased a total of 158 acres from Elmer, Ronald and Terry at a cost of $7,900 per year. Additionally, Ronald and Terry assigned their interest as lessee in an oral lease to farm 80 acres of

land owned by Lyle Ashby. The lease amount was $5,500 per year.

As a result of the above transactions, Lindstrom was the lessee of approximately 878 acres of farmland at a total cost of $44,400 per year. Additionally, Lindstrom was the contract purchaser of 120 acres of farmland in which she owned a one-half undivided interest as contract seller. Prior to this time, Lindstrom had never engaged in farming operations as either a landlord or a tenant.

Anderson testified that on May 8, he received a phone call from Ronald. Ronald stated that he would not assign his rights under the contract for the 120 acres (it should be noted that, at this time, he could not have assigned his rights under the contract as he had already assigned them to Lindstrom on May 2), but would pay the $60,000 balance due on the 1983 installment from the proceeds of the sale of the PIK corn. Ronald also asked Anderson to refrain from attempting to collect the loan and to wait until fall for the 1984 installment payment. Ronald testified that he does not remember this conversation.

On June 2, there were more transactions involving the Hanses and Lindstrom. Ronald and Terry transferred automobiles, snowmobiles and a boat to Lindstrom as further payment on the demand note. This property was valued at approximately $17,000. Ronald and Terry retained exclusive possession and use of all property transferred to Lindstrom.

On June 21, representatives of CPCA again met with Ronald. CPCA had learned that the PIK corn was being sold and requested the proceeds of the sale. Ronald refused to tender the checks at this time but eventually the Hanses did tender checks totalling $60,479.88.

On July 12, in "Report of Acreage Reports" filed with the ACSC, Ronald and Terry listed themselves as producers on all land being farmed in 1984. They also assigned their rights to payments they were entitled to under government programs to Lindstrom as security for "final rent payments that will be advanced." The record does not reflect the value of these rights or the amount of money Ronald and Terry were entitled to under these government programs. The record is also silent as to any lease in which Lindstrom was the lessor and Ronald and Terry the lessees, or any lease in which Ronald and Terry were obligated under and Lindstrom was paying so as to give rise to an advancement of "final rent payments." Early in October 1984, CPCA became aware that the corn grown by the Hanses in 1984 was being marketed under the name of Julie Lindstrom.

PROCEDURAL HISTORY

On October 25, CPCA filed a replevin action seeking possession of all property listed on the security agreement executed by the Hanses and their wives. On November 15, pursuant to a court order and stipulation of the parties, the proceeds from the sale of the 1984 corn crop, which were arguably subject to the security interest of CPCA, were deposited with the clerk of the circuit court pending the final outcome of the proceedings. Also, possession of all property listed in the security agreement was to be turned over to CPCA.

On December 13, in a separate action, judgment was entered against the Hanses and in favor of CPCA on the original notes held by CPCA in the sum of $388,946.43.

On January 8, 1985, defendant Lindstrom filed a motion for summary judgment in the replevin action. This motion asked the court to find that any crops that had been grown in 1984, or the proceeds from the sale of those crops, were not subject to CPCA's security interest. On February 4, 1985, the court granted Lindstrom's motion in part. The court found that the proceeds from the sale of corn grown on land known as the "Maring Farm" only were not subject to CPCA's security interest and, therefore, ordered those proceeds to be released by the clerk to Lindstrom.

On March 24, 1986, CPCA amended its complaint by adding a second count requesting $107,073.42. This sum represented the proceeds of the sale of the 1983 corn crop which were deposited in the BE&L account and later paid to Lindstrom pursuant to the demand note. CPCA alleged that it had a security interest in these proceeds and the earnings thereon. Lindstrom filed a motion to dismiss count II, and this motion was denied on May 27, 1986.

The cause proceeded to a jury trial on both counts of the complaint. After the plaintiff's case in chief and during the presentation of defendant's evidence, the court informed the jury that it no longer had to concern itself with count II. The court entered a directed verdict on count II. The court found that the proceeds from the sale of the 1983 corn crop were not traceable and, therefore, CPCA was not entitled to $107,073.42. The court did enter judgment for CPCA in the reduced amount of $18,512. This was determined by the court to be the "lowest intermediate balance." Concerning count I, the jury returned a verdict in favor of Lindstrom, and the court entered judgment accordingly. The court also ordered the clerk to turn over the monies deposited with the court to Lindstrom.

On September 12, 1986, CPCA filed its post-trial motion. CPCA requested the court to enter judgment *n.o.v.* on count I of the com-

plaint. CPCA also requested the court to set aside the $18,512 judgment on count II and enter judgment for $107,073.42, the amount sought in the complaint. Alternatively, CPCA requested the court to grant a new trial on both counts of the complaint. CPCA argued that there was error in the instructions given and also that it had discovered new evidence that would alter the outcome of the trial.

The new evidence that CPCA had discovered consisted of testimony by Evelyn Prins, former wife of Terry Hans. Prins testified in an affidavit to a plan undertaken by the Hanses to dispose of assets and thus defraud creditors. The affidavit provided details of the plan and recalled steps taken in furtherance of the plan. The court, after a hearing on the diligence of CPCA to discover this evidence prior to trial, granted CPCA's motion for a new trial.

Defendant Lindstrom filed a petition for leave to appeal from the court's grant of a new trial. This court denied Lindstrom's petition on January 13, 1987. Lindstrom then filed a motion to vacate the order granting a new trial. The trial court denied this motion on procedural grounds. Lindstrom then filed a motion to reconsider her motion to vacate and also sought certification of the issue surrounding the grant of a new trial. The trial court denied the motion to reconsider but certified the issue. This court again denied Lindstrom's petition for leave to appeal.

Prior to the retrial, Lindstrom filed a motion for summary judgment. Lindstrom also filed a motion for clarification asking the court to clarify if the retrial would be as to both counts of the complaint or only count I. The court denied summary judgment and stated that the new trial would be confined to count I of CPCA's complaint.

On September 12, 1988, Elmer, Terry, Ronald and Judith Hans were dismissed from the lawsuit due to the court's finding that the only relief sought was from Lindstrom. On September 30, Lindstrom filed a section 2—611 motion seeking fees incurred as a result of the preparation and filing of the affidavit of Evelyn Prins. Lindstrom also filed a motion seeking damages for loss of use of the monies being held by the court pending final outcome of the case. The case proceeded to trial, and the jury returned a verdict in favor of Lindstrom. The court entered judgment accordingly.

CPCA filed a timely notice of appeal. CPCA contends that the court erred in the initial trial by limiting its directed verdict on count II to $18,512. CPCA argues that it should have received judgment for $107,073.42. CPCA also contends that the court erred subsequent to the second trial by denying its motion for judgment *n.o.v.* or, in the alternative, for a new trial as to count I. Lastly, CPCA contends that

the court improperly instructed the jury on the issues and law of the case.

Lindstrom filed a cross-appeal. Lindstrom contends that CPCA executed a release that constitutes a bar to this action. Lindstrom also contends that the trial court erred in granting CPCA's motion for a new trial. Lastly, Lindstrom contends that the court erred by denying her section 2—611 petition for fees.

The first issue raised in the cross-appeal is whether the court erred in finding that the letter agreement of September 11, 1986, did not operate to release Lindstrom. The pertinent portions of the letter agreement are as follows:

> "This letter will serve to confirm to you that Central Production Credit Association, formerly Northwest Illinois Production Credit Association, and the Federal Land Bank Association of St. Louis will not at any time on or after the date of this letter attempt to levy on any property owned by you to satisfy any judgment which would be outstanding in favor of said organizations ***.
>
> This letter will also serve to confirm to you that there are no other notes or obligations of any kind which you have signed creating a debt due from you to Central Production Credit Association or the Federal Land Bank Association of St. Louis, and therefore, *except for the judgments obtained in the above identified law suits*, you have no further obligation to either Central Production Credit Association or the Federal Land Bank Association of St. Louis." (Emphasis added.)

The letter was signed by:

> "James G. Madden
> On behalf of Central Production
> Credit Association and Federal
> Land Bank Association of St. Louis"

Lindstrom contends that this document constitutes a release, and the release of one joint debtor acts as a release of all joint obligors. CPCA contends that this document is not a release and is simply an agreement to refrain from a particular method of collection of a judgment and, at most, is a covenant not to sue. We agree with CPCA that this is not a release.

A release is a contract by which a party abandons a claim to the other party against whom the claim exists. (*Aqua-Aerobic Systems, Inc. v. Ravitts* (1988), 166 Ill. App. 3d 168, 171.) The interpretation of a release is governed by the principles of contract law. (*Aqua-Aerobic*, 166 Ill. App. 3d at 171.) When the written contract is clear and ex-

plicit, the court should determine the meaning and intention of the parties from the face of the document and enforce the contract as written. *Costa v. Stephens-Adamson, Inc.* (1986), 142 Ill. App. 3d 798, 800.

■ It is clear from the language of the document that the parties did not intend to release any claims existing at the time the document was signed. The agreement expressly acknowledges the existence of a judgment outstanding against Evelyn Prins. The agreement states that CPCA and the Federal Land Bank Association of St. Louis "will not *** attempt to levy on any property owned by you to satisfy any judgment." It is clear from this language that the parties do not intend to release the claims against Evelyn Prins or any other party. The agreement simply recites in clear and unambiguous language that the judgment creditors will not attempt to levy on property owned by Evelyn Prins. This document is not a release and does not act as a bar to this lawsuit.

■ The next issue raised by the cross-appeal is whether the trial court erred in granting plaintiff's motion for a new trial based upon the discovery of new evidence. It is within the trial court's discretion to grant a motion for a new trial, and the court's decision will not be disturbed absent a clear abuse of that discretion. (*Ervin v. Sears, Roebuck & Co.* (1976), 65 Ill. 2d 140, 144.) To support the grant of a new trial, the new evidence must: (1) appear to be of such conclusive character that it will probably change the result of the trial; (2) have been discovered since the trial; (3) be such as could not have been discovered before the trial by the exercise of due diligence; (4) be material to the issues involved; and (5) not be simply cumulative to evidence presented at the initial trial. *Loitz v. Remington Arms Co.* (1988), 177 Ill. App. 3d 1034, 1049, citing *Powers v. Browning* (1954), 2 Ill. App. 2d 479, 486-87.

Defendant claims that the first and third requirements were not established. Defendant points out that the result of the second trial was identical to that of the first. Therefore, the evidence could not have been of a conclusive character such that the result of the trial would be different.

Defendant misstates the law by claiming that "the evidence must be so conclusive as to guarantee a change in the outcome of the case." The court, using the correct standard, found that the testimony of Evelyn Prins was of such a nature as to *probably* change the result of the trial if a new trial was granted. The court considered her position as a member of the family during the time period in question, and the court noted that she was a codefendant in the proceedings. Her testimony as to a conscious plan to defraud or hinder creditors could very

well influence the jury's verdict.

Defendant also asserts that the new evidence would have been discovered by plaintiff had it exercised due diligence. To support this contention, defendant points out that Evelyn Prins was a party to the lawsuit and should have been deposed prior to trial. Defendant cites *Saad v. South Side Bank* (1978), 62 Ill. App. 3d 493, for the proposition that the failure to do discovery cannot be the basis for the granting of a new trial.

The court held a hearing solely on the issue of the diligence exercised by plaintiff in discovering the new evidence prior to trial. While it is true that a failure to do discovery cannot be the basis for a new trial, the court noted that plaintiff engaged in extensive discovery. Plaintiff deposed Elmer, Ronald and Terry Hans and Julie Lindstrom. At no time during these depositions did anyone indicate that Evelyn Prins was present during the discussions involving "estate planning" or that Prins was privy to any activity that reasonably could be interpreted as relevant or material to these proceedings. Also, plaintiff did attempt to secure Prins' presence by a Rule 237 request filed prior to trial. (107 Ill. 2d R. 237.) The court concluded that the plaintiff did exercise due diligence in this cause and, therefore, the motion for a new trial was granted. We find that the court conducted a full and fair hearing and it was not an abuse of discretion to grant a new trial in this cause.

Defendant also claims in her cross-appeal that the court erred in denying her motion to have the jury assess the amount of damages sustained as a result of her loss of use of her property. Defendant's argument is confusing and sets forth no authority whatsoever to support her position. This is done in violation of Supreme Court Rule 341(e)(7) (113 Ill. 2d R. 341(e)(7)). It is well established that bare contentions without citation to authority do not merit consideration on appeal. (*Britt v. Federal Land Bank Association* (1987), 153 Ill. App. 3d 605, 608.) Defendant has waived this contention.

The last issue raised by defendant's cross-appeal is whether the trial court erred in denying defendant's petition for fees pursuant to section 2–611 (Ill. Rev. Stat. 1987, ch. 110, par. 2–611). Defendant contends that the affidavit filed by Evelyn Prins was false. Defendant notes that Prins' testimony at the second trial did not coincide exactly with the statements made in her affidavit. Therefore, defendant contends that the affidavit was a false pleading under section 2–611 and attorney fees are warranted.

We find that this contention lacks merit. Defendant has not established that the affidavit in question is false. While Prins' testimony

is not a verbatim recitation of her affidavit, it is not inconsistent or contrary to the affidavit. Additionally, defendant has not cited any authority supporting her request for fees. As previously stated, this is in violation of Supreme Court Rule 341(e)(7) (113 Ill. 2d R. 341(e)(7)). The award of attorney fees is not warranted under the facts of this case. Therefore, the court was correct in not awarding defendant fees pursuant to section 2—611.

The first issue raised by the plaintiff on appeal is whether the trial court erred by entering a directed verdict on count II for $18,512. The court held that plaintiff was entitled to the proceeds of the sale of the 1983 corn crop but only to the extent that the proceeds could be identified and traced. The court applied the lowest intermediate balance rule and found that plaintiff was only entitled to $18,512. A directed verdict was entered for that amount.

It is undisputed that plaintiff had a security interest in the proceeds from the sale of crops grown in 1983. Plaintiff contends that these proceeds are easily traced to Lindstrom. The proceeds, $107,073.42, were deposited in the account maintained with BE&L. Funds were transferred from the cash account to the commodities account when commodities contracts were purchased. The contracts were later sold and the proceeds transferred back into the BE&L cash account. Lindstrom was then paid out of this account, and the remaining balance was zero. Plaintiff contends that the court erred in applying the lowest intermediate balance rule and should have entered judgment in its favor for $107,073.42, the total proceeds from the sale of the 1983 crop.

The defendant contends that the lowest intermediate balance rule applies. Further, plaintiff did not establish that the money paid to Lindstrom was money in excess of the lowest intermediate balance. Defendant argues that the plaintiff has not shown that Lindstrom is in possession of any particular property over which plaintiff has a security interest, i.e., plaintiff cannot trace the proceeds from the sale of corn out of the BE&L account, back into it, and then to Lindstrom. Therefore, if plaintiff is entitled to any money, the amount is limited to the lowest intermediate balance of $18,512. Additionally, defendant claims that this sum was arrived at by agreement of the parties.

Initially, we note that the plaintiff denies that there was an agreement with respect to the entry of a directed verdict in the amount of $18,512. We have reviewed the record and found that while plaintiff raised this issue as error in both of its post-trial motions, defendant did not mention this agreement to the trial court when rebutting plaintiff's arguments. Furthermore, there is no evidence in the record that the

court entered the directed verdict pursuant to agreement. Therefore, we find that the parties were not in agreement regarding the entry of a directed verdict.

■ In *C.O. Funk & Sons, Inc. v. Sullivan Equipment, Inc.* (1982), 89 Ill. 2d 27, the plaintiff sold a farm implement business to the defendant. The defendant executed a security agreement in favor of the plaintiff to secure payment of the unpaid purchase price. The security agreement covered specific inventory, equipment and the proceeds from the sale thereof. The defendant sold certain inventory, and, instead of giving the proceeds to plaintiff, the defendant deposited the proceeds into its general business account. From this account, the defendant purchased new inventory. The inventory purchases were far in excess of the amount of proceeds deposited in the general business account and were partly purchased with money borrowed from a bank. The bank received a security interest in the new inventory and any after-acquired property. The defendant experienced financial difficulties and was forced to auction off the new inventory. The plaintiff sought to recover the amount of the proceeds from the monies taken in at the auction. Plaintiff claimed its security interest was superior to the bank's. The court stated that plaintiff would only be entitled to the monies taken in at the auction if it could identify and trace the monies back to the proceeds deposited in the general business account. The court applied the lowest intermediate balance rule to trace the proceeds. The court explained the rule as follows:

> "The rule, which operates on a common-sense view that dollars are fungible and cannot practically be earmarked in an account, provides a presumption that proceeds remain in the account as long as the account balance is equal to or greater than the amount of the proceeds deposited. The proceeds are 'identified' by presuming that they remain in the account even if other funds are paid out of the account. If Sullivan is likened to the trustee of a constructive trust imposed because he commingled funds, then the lowest-intermediate-balance rule directs that Funk's proceeds in Sullivan's account are preserved to the greatest extent possible as the account is depleted. [Citations.] Under the rule, however, if the balance of the account dips below the amount of deposited proceeds, Funk's security interest in the identifiable proceeds abates accordingly. This lower balance is not increased if, later, other funds of the debtor are deposited in the account, *i.e.*, the added amounts are not subject to an equitable lien, unless the latter deposits are made in restitution." (89 Ill. 2d at 31-32.)

The court stated that since the plaintiff was asserting a prior security interest, the plaintiff had the burden of identifying and tracing the proceeds. The plaintiff could not show that "the proceeds" were used to purchase a *specific item of inventory* so the security interest in the proceeds did not attach to any specific item sold at the auction. Additionally, the plaintiff produced no evidence of the balance in the defendant's business account during the time in question so the lowest intermediate balance was never established. Therefore, the proceeds that the plaintiff claimed he was entitled to had not been identified as remaining in the account.

■ Comment *d* to section 212 of the Restatement of Restitution, which discusses the lowest intermediate balance rule, provides:

"The rule stated in this Section is not applicable where the money withdrawn or traceable proceeds of that money are redeposited. If the money withdrawn from the account is subsequently redeposited in the account, the effect is the same as though the withdrawal had not been made, and the claimant's lien is not limited to the lowest intermediate balance. It is immaterial whether the money withdrawn was itself redeposited, or the money withdrawn was invested and the investments were sold and the proceeds were redeposited." Restatement of Restitution ■212, comment *d* (1937).

It is undisputed in this case that CPCA had a security interest in the corn grown by the Hanses in 1983. It is also clear that when the corn was sold, CPCA's security interest attached to the proceeds. (See Ill. Rev. Stat. 1987, ch. 26, par. 9—306.) The Hanses admit that the proceeds were deposited into the account maintained at BE&L. The Hanses also admit that monies from this account were used to purchase contracts for cattle commodities. The contracts were sold and the proceeds redeposited in the BE&L account. Lindstrom was then paid with monies in this account.

■ This situation is identical to the one set forth in comment *d* to section 212. Specifically, the traceable proceeds of the sale of the 1983 corn crop were withdrawn from the BE&L account, used to purchase specific items or investments, the investments were sold, and the proceeds were redeposited in the BE&L account. The lowest intermediate balance rule does not apply here, as the proceeds are treated as if they were never withdrawn. Plaintiff's lien is not limited to the lowest intermediate balance. Additionally, this case is distinguishable from *Funk* in that plaintiff here has been able to trace the proceeds of the sale of a secured item. Applying the exception to the rule set forth in comment *d*, the proceeds never left the account and are clearly

traceable to Lindstrom. Plaintiff's security interest remains attached to the total proceeds from the sale of the 1983 corn crop. When Lindstrom took possession of these proceeds, she did so subject to plaintiff's security interest.

It appears that the trial court erred in applying the lowest intermediate balance rule. Therefore, while the directed verdict for plaintiff should be affirmed, the case should be remanded and the trial court directed to enter judgment as a matter of law for plaintiff in the sum of $107,073.42.

■■■ We note that in its complaint, plaintiff also requested the earnings on the $107,073.42 as additional relief. There was no evidence presented at trial to establish what the earnings were. Plaintiff did not raise this issue at trial or on appeal. Therefore, plaintiff is only entitled to the amount of the proceeds deposited, $107,073.42.

The next issue as framed by appellant is whether the court erred in denying plaintiff's motion for judgment *n.o.v.* or, alternatively, for a new trial on count I of plaintiff's complaint. Factually, this translates into who is entitled to the proceeds from the sale of the 1984 corn crop. These proceeds are currently being held by the clerk of the circuit court. It is undisputed that Elmer, Ronald and Terry Hans granted a security interest to CPCA in:

> "All the following crops: Corn, Oats, Soybeans, Hay, Wheat and Pasture which are now or will during the term of this Security Agreement become growing: (1) upon the farm real estate occupied, owned or operated by debtor."

The security agreement went on to identify and describe certain tracts of land that the Hanses were farming. This document was executed on June 6, 1983.

CPCA contended that in 1984, Ronald and Terry Hans farmed the land listed in the security agreement. Therefore, CPCA had a security interest in the crops grown on those lands in 1984. Additionally, when the crops grown in 1984 were sold, CPCA's interest attached to the proceeds. If Lindstrom has any interest in these proceeds, it was obtained through a series of fraudulent transactions.

After the first trial, the jury returned a verdict stating that Lindstrom was the owner of the crops grown on the land in question. After the second trial, the jury returned a similar verdict. Plaintiff argues that, based upon the evidence, this conclusion is in error and should not be allowed to stand.

Lindstrom claims that CPCA has waived this issue. Lindstrom argues that the plaintiff did not set forth a claim of fraudulent conveyances in its complaint, did not present this claim at trial and did not

include this claim in its post-trial motion. Therefore, this claim is waived.

Count I of plaintiff's amended complaint contains the following allegations:

"4. The property is wrongfully detained by the defendants.

* * *

9. That whatever claims are asserted by the defendant, Julie Lindstrom, arise out of transactions that exist in form only and are not founded upon any substantive transactions.

10. In the alternative if the transactions upon which the defendant, Julie Lindstrom, claims she has an interest in the corn raised in 1984 are substantive in nature, said transactions were entered into by the defendants with the intent to defraud the plaintiff in that the defendants or some of them concealed the aforesaid transactions from the plaintiff, in order to influence the plaintiff not to take any action to attempt to collect the debt due from all of the defendants except Julie Lindstrom to the plaintiff and that such concealment was intended to fraudulently deceive and injure the plaintiff and that the plaintiff was injured in that it took no action to repossess the machinery and equipment used by the defendants or some of them in the farming operation in the cropping year 1984 until after the growing season was over and withheld taking any action to attempt to collect the debt due to it from the defendants."

Plaintiff's arguments and proofs at trial were clearly directed at the overall scheme or plan carried out by Lindstrom and the Hanses. Plaintiff's brief on appeal contains an extended discussion of the principles applied in cases in which relief is requested due to fraudulent conveyances. This analysis is used to further set forth the overall scheme engaged in by the defendants.

Defendant is correct in stating that plaintiff did not ask the trial court to set aside conveyances due to their fraudulent nature. Defendant is also correct in stating that this request was not included in plaintiff's post-trial motion. However, defendant is not correct in characterizing plaintiff's arguments to this court as a request to set aside conveyances. Plaintiff has presented this theory to bolster its contention that there was a scheme to defraud or hinder creditors. The fraudulent conveyances were only a part of that scheme. We interpret plaintiff's argument to be based upon a fraudulent scheme engaged in by the defendants. These allegations were set forth in the complaint, presented at trial, and reiterated in plaintiff's post-trial motion. We do not find that plaintiff has waived the argument that the court erred in de-

nying its motion for judgment *n.o.v.* or, in the alternative, a new trial.

■■ A judgment *n.o.v.* should be entered only when all the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.) A new trial should be granted when the jury's verdict is against the manifest weight of the evidence. *Pedrick*, 37 Ill. 2d at 509.

Plaintiff in this case is not seeking to rescind conveyances of property in order to establish its right to the proceeds of the 1984 corn crop. This tactic is appropriate because most of the corn grown in 1984 was not grown on land *conveyed* to Lindstrom by Elmer, Ronald and Terry Hans. The corn was grown on land technically leased by Lindstrom. This is not a case in which the Hanses were lessees and assigned their rights as lessees to Lindstrom. Lindstrom executed these leases in her own name. The only interests in land that were conveyed were Elmer's interest as contract seller and Ronald's and Terry's interest as contract purchasers of a 120-acre tract. Ronald and Terry also assigned their interests as lessees under an oral lease to farm the 80-acre Ashby farm. Plaintiff is not attempting to have these conveyances set aside. Plaintiff uses the fraudulent-conveyance analysis to show that Lindstrom's and the Hanses' conduct was part of a scheme devised to defraud creditors.

In *Robinson v. Brems* (1878), 90 Ill. 351, two brothers operated a cigar and tobacco shop. They were burned out in 1871 by the great Chicago fire. At the time of the fire, they were approximately $28,000 in debt to certain creditors. In 1872, the brothers opened a restaurant, saloon and cigar business, but the business was put in the appellants', their wives', names. This business generated between $4,000 and $5,000 profit per year. The previous creditors attached certain property used in the business to satisfy the existing debt. The appellants filed a replevin action claiming the property did not belong to their husbands and could not be used to satisfy the outstanding debt. The appellants argued that the money used to start the new business was their separate property. They also claimed that their husbands were simply employees of the business. The creditors claimed that this was all a fraudulent device to protect the husbands' property and to prevent the collection of debts previously incurred by them. The creditors also presented evidence to show that insurance money collected by the brothers after the fire was unaccounted for. The creditors contended that this was the money used to start the new business. The court stated:

"[T]here is much to be found in the surrounding circumstances and in the conduct of the parties, \*\*\* tending strongly to show a collusive and fraudulent arrangement to hinder and delay creditors in the collection of their debts." (*Robinson*, 90 Ill. at 353.)

The court, addressing an instruction given at trial, found that a correct principle of law was announced by the following instruction:

"[If] a collusive arrangement existed between appellants and their husbands, by which it was secretly understood between them the names of appellants should be used in the business, and that appellants should hold their husbands' property and business, then such conduct was fraudulent and unlawful as against the distress warrant, and in such case the jury should find against them." *Robinson*, 90 Ill. at 355.

In *Alsdurf v. Williams* (1902), 196 Ill. 244, the court was faced with the same issue. While the court held that under the facts of that case there was no fraud, and the business was truly the property of the wife, the court did set forth the following principle:

"A husband cannot rightfully carry on his business in his wife's name under an assumed agency. He cannot use his wife's name as a mere device to cover up his property or keep from his creditors the profits of a business which is, in fact, his. A wife cannot hold the property of her husband to delay, hinder or defraud his creditors." (*Alsdurf*, 196 Ill. at 248.)

(See also *Osborn v. Albers* (1937), 365 Ill. 631, 635.) "[T]he question of fraud is one of fact to be determined in each case, but, because of the opportunity for fraud and connivance, such an arrangement between husbands and wives will be closely scrutinized." *Osborn*, 365 Ill. at 637.

In the case at bar, plaintiff has presented the argument that Lindstrom and the Hanses engaged in a fraudulent scheme to defraud, delay, or hinder the Hanses' creditors. Similar to *Robinson*, the Hanses' farming operations were placed in another's name. There was a series of transactions in which assets were conveyed or assigned to Lindstrom. It is admitted that Ronald and Terry provided all the labor on the farms. There is no evidence of any wages paid to them for this labor. It is also admitted that Lindstrom had never engaged in farming operations prior to 1984. In fact, in March 1984 Lindstrom assigned any interest she had in the Hanses' farming operation to Ronald and Terry. It is paradoxical that shortly after doing this, she virtually took over the entire Hanses' farming operation. Additionally, the money to run the farming operation was the money that Terry and Ronald paid

Lindstrom on the note. It is abundantly clear that Lindstrom and the Hanses set out to hinder or delay creditors.

While the above-cited cases involve a marital relationship, we see no reason not to extend it in this case to father/daughter or brother/sister relationships. The family relationship of the parties should cause their conduct to be closely scrutinized. (See *Martin v. Duncan* (1895), 156 Ill. 274, 280-81; *Beery v. Hurd* (1938), 295 Ill. App. 124, 132.) It is clear that the Hanses carried on their farming operation in Lindstrom's name in an attempt to place the fruits of the operation, the crops or proceeds therefrom, out of the reach of creditors. These "fruits" could then be used to continue the operation. It is the substance of the transactions, not the form, that determines the rights of the parties. (*Reese v. Melahn* (1973), 53 Ill. 2d 508, 513.) Courts will disregard names and penetrate disguises to determine the substance of an act or transactions and will not be misled by devices and subterfuges. (*Roth v. Carlyle Real Estate Limited Partnership VII* (1984), 129 Ill. App. 3d 433, 438.) Equity will not allow a person to benefit from a fraud. (*Callner v. Greenberg* (1941), 376 Ill. 212, 215.) These general equitable principles support the finding that these acts and transactions were fraudulent. Lindstrom and the Hanses were attempting to hide behind form and ignore the actual substance of their conduct. They should not benefit from this attempt.

We believe the *Pedrick* standard for the entry of a judgment *n.o.v.* has been met in this case. When reviewing the evidence in the light most favorable to defendant, the evidence overwhelmingly favors plaintiff, and the contrary verdict reached in this case cannot stand. Therefore, the trial court was incorrect in denying plaintiff's motion for a judgment *n.o.v.*

Due to the decisions previously set forth, it is not necessary to address plaintiff's claims of error concerning the instructions given.

The decision to deny plaintiff's motion for judgment *n.o.v.* is reversed, and the cause is remanded with instructions to enter judgment for plaintiff on count I of the complaint in the amount of the proceeds held by the clerk of the circuit court of Carroll County. The judgment entered in favor of plaintiff on count II is affirmed, and the cause is remanded with instructions to the court to enter judgment for $107,073.42 in favor of plaintiff and against defendant Lindstrom on this count.

Affirmed in part, reversed in part, and remanded.

LINDBERG and REINHARD, JJ., concur.