**United States Court of Appeals**

**FOR THE EIGHTH CIRCUIT**

_____

Nos. 96-2346/2414

_____

Dale Meyer, doing business as     *
Wagner Livestock Sales Company,    *
                                *
      Cross Appellant/Appellee,     *
                                *   Appeals from the United States
      v.                            *   District Court for the District
                                *   of South Dakota.
Norwest Bank Iowa, National       *
Association,                        *
                                *
      Appellant/Cross Appellee.     *

_____

Submitted: March 13, 1997

Filed: April 30, 1997
_____

Before WOLLMAN and MURPHY, Circuit Judges, and GOLDBERG,[1] Judge.
_____

MURPHY, Circuit Judge.

This case involves a dispute between a livestock sales barn and a bank arising out of two dishonored checks. The sales barn, Wagner Livestock Sales Company (WLS), sold cattle to a feedlot, D&R Feedlots, which paid with two checks. The feedlot's bank and secured creditor, Norwest Bank Iowa, did not honor the checks because it had closed the account under a setoff agreement with the feedlot. WLS sued the bank for conversion, the jury awarded WLS $216,518.30, and the district court denied the bank's motion for judgment as a matter of law. On appeal the bank claims it is entitled to judgment, and WLS argues that the jury instructions erroneously limited its recovery. We reverse.

_____

[1]The Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

The feedlot purchased cattle from sale barns, such as WLS, and sold them to meat packers at slightly higher prices.  As its business grew, it experienced cash flow problems.  Since the feedlot regularly purchased cattle from WLS, the two reached an understanding that when the feedlot purchased cattle, WLS would hold the check for a week before depositing it.

The bank was a creditor of the feedlot.  During relevant time periods the bank had extended a line of credit to the feedlot and maintained a security interest in its cattle, accounts and other payables, machinery and vehicles, and certain certificates of deposits.  The feedlot also maintained a demand deposit checking account with the bank, the terms of which gave the bank a right to setoff any amounts the feedlot owed the bank.  The feedlot regularly deposited proceeds from different cattle sales into this account and used the account to pay various operating expenses.

The bank was generally aware of how the feedlot conducted its business and would periodically inspect the collateral offered to secure its loan.  Part of this collateral was the feedlot's inventory of cattle.  Typically, a bank representative would travel to the feedlot once a month and find 1,500 to 1,800 head of cattle, valued from $1.5 million to $1.7 million.

On February 10, 1994, a bank representative inspected the  collateral and found fewer than 300 head of cattle.  The bank became concerned that the feedlot had insufficient collateral to secure its obligations to the bank and put a hold on the feedlot's account on February 11, 1994.  At that time the account contained $27,846.81.  On February 14, 1994, the bank closed the account and applied these remaining funds towards the feedlot's debt to it.

This dispute arose because the feedlot had incurred obligations to WLS prior to the actions taken by the bank limiting access to the account. On February 1, 1994, the feedlot gave WLS

a check for $246,048.13 to pay for cattle purchased that day.  WLS did not present the check for payment until February 7, 1994, and the check was returned for insufficient funds.  When WLS redeposited the check, it was returned a second time and marked "account closed."  In the meantime, the feedlot had purchased an additional $73,777.57 worth of cattle from WLS on February 8.  WLS held this check as well, depositing it on February 14.  This second check was also returned and marked "account closed."

The cattle purchased from WLS in these transactions were either resold or held in inventory.  Some cattle were immediately resold to a meat packing operation called IBP, Inc. (IBP); the proceeds were deposited in the feedlot's account on or before February 11, 1994.  The other cattle were shipped directly to the feedlot and held as inventory.

WLS sued the bank in March of 1994, alleging conversion, common law fraud, deceit, and breach of fiduciary duty.  The district court granted partial summary judgment for the bank, dismissing all claims against it other than conversion.

At trial, WLS argued that it had a proprietary interest in the cattle it sold the feedlot, that it had a traceable interest in the proceeds deposited into the feedlot's account, and that the bank had wrongfully converted that money when it setoff the debts the feedlot owed the bank.  WLS's conversion claim encompassed both proceeds from the sale of cattle to IBP and the value of the cattle shipped directly to the feedlot.  The instructions to the jury on damages limited the possible recovery to the amount of the proceeds from the IBP sales, and WLS argues on its cross appeal that it should also have included the value of cattle shipped directly to the feedlot.

The standard of review of the denial of a motion for judgment as a matter of law is de novo. Lamb Eng'g & Constr. Co. v. Nebraska Pub. Power Dist., 103 F.3d 1422, 1430 (8th Cir. 1997). The district court used the South Dakota rule for determining such a motion which is to

> view the evidence in a light that is most favorable to the non-moving party and give that party the benefit of all reasonable inferences that fairly can be drawn from the evidence. . . . If sufficient evidence exists so that reasonable minds could differ, a [judgment as a matter of law] is not appropriate.

Olson v. Judd, 534 N.W.2d 850, 852 (S.D. 1995)(citations omitted). This is similar to the federal rule which requires that a jury verdict be affirmed "unless, viewing the evidence in the light most favorable to the prevailing party, we conclude that a reasonable jury could have not found for that party." Chicago Title Ins. Co. v. Resolution Trust Corp., 53 F.3d 899, 904 (8th Cir. 1995). Under either formulation the result here is the same.

The act that WLS claims was a conversion of its property was the bank's hold placed on the feedlot's account on February 11, 1994. The jury was told in Instruction 11 that WLS was required to prove the following elements to establish conversion by the bank:

1. That WLS had an ownership or possessory interest in feedlot's deposits;

2. That WLS's possessory interest in those deposits was greater than that of the bank;

3. That the bank's exercise of dominion and control over the deposits was inconsistent and in derogation of WLS's possessory interests in the deposits; and

4. That WLS suffered damages as a result.

In order to demonstrate an ownership or possessory interest in funds in the feedlot's account, WLS offered evidence to show that it sold cattle to the feedlot which were then sold to the packer IBP for cash, which was deposited into the feedlot account. In other words, WLS believes that its ability to trace proceeds from the cattle sales into the account before February 11, 1994 demonstrates that the bank converted those funds when it closed the account on that date. The bank counters that tracing the funds into the account at some point prior to its placing the hold is not sufficient; the funds would have had actually to be in the account at the time of the hold.

Under South Dakota law, "[t]racing is an equitable principle which allows a party with the right to property to trace that property through any number of transactions in order to reach the final proceeds or result." Temple v. Temple, 365 N.W.2d 561, 567 (S.D. 1985). Tracing is allowed "so long as such property, its product or its proceeds is capable of identification. McFarland v. McFarland, 470 N.W.2d 849, 852 (S.D. 1991).

WLS's ability to trace the funds into the account before February 11, 1994 is not sufficient to establish an ownership or possessory interest in those proceeds. In order to demonstrate that the bank converted its property, WLS must demonstrate an ownership or possessory interest in the account at the time of the alleged conversion. Restatement (Second) of Torts §§ 224A, 225; 89 C.J.S. Trover & Conversion §§ 72, 99(c) (1955 & Supp. 1996); See, e.g., Bradford v. Dumond, 675 A.2d 957, 962 (Me. 1996); Huntsville Golf Dev., Inc. v. Ratcliff, Inc., 646 So.2d 1334, 1336 (Ala. 1994); Napoleon Livestock Auction, Inc. v. Rohrich, 406 N.W.2d 346, 352-53 (N.D. 1987); Western Idaho Prod. Credit Ass'n v. Simplot Feed Lots, Inc., 678 P.2d 52, 54 (Ida. 1984); Allen v. Dealer Assistance, Inc., 299 N.W.2d 744, 747 (Neb. 1980); Prod. Credit Ass'n of Chippewa Falls v. Equity Coop Livestock Sales Ass'n, 261

N.W.2d 127, 129 (Wis. 1978); <u>Larson v. Archer-Daniels-Midland Co.</u>, 32 N.W.2d 649, 650 (Minn. 1948). If the claimant cannot show a possessory interest in the property at the time of the alleged conversion, it cannot demonstrate that the defendant's actions actually interfered with the property. The key question is whether WLS was able to identify an ownership or possessory interest in the account funds on February 11, 1994, the date the bank allegedly converted WLS's property.

This inquiry is complicated by the fact that the account held funds from a number of sources. In a variety of contexts, courts have traced commingled funds in a bank account by using the "lowest intermediate balance" rule.[2] <u>In re Columbia Gas Sys., Inc.</u>, 997 F.2d 1039, 1063 (3rd Cir. 1993)(rights of trust beneficiaries in a commingled account); <u>Harley-Davidson Motor Co. v. Bank of New Eng.-Old Colony</u>, 897 F.2d 611, 622 (1st Cir. 1990)(secured party's interest in a commingled account); <u>First Wis. Fin. Corp. v. Yamaguchi</u>, 812 F.2d 370, 375 (7th Cir. 1987)(liability of guarantor for commingled funds); <u>United States v. Banco Cafetero Pan.</u>, 797 F.2d 1154, 1159 (2d. Cir. 1986)(commingled funds in drug forfeiture case); <u>Universal C.I.T. Credit Corp. v. Farmers Bank of Portageville</u>, 358 F. Supp. 317, 325 (E.D. Mo. 1973)(secured party's interest in commingled account). Under the lowest intermediate balance rule, it is assumed the traced proceeds are the last funds withdrawn from a contested account. <u>In re Columbia</u>, 997 F.2d at 1063. Once the traced proceeds are withdrawn, however, they are

---

[2]WLS argues that the bank failed to raise arguments premised on the lowest intermediate balance rule in a timely fashion before the district court. However, the district court discussed the application of the rule in its memorandum opinion, both parties briefed it on appeal, and it is a purely legal issue which does not require additional fact finding. In these circumstances it is not inappropriate for us to consider the application of the lowest intermediate balance rule. <u>See, e.g.</u>, <u>Digi-Tel Holdings, Inc. v. Proteq Telecomm. (PTE), Ltd.</u>, 89 F.3d 519, 523 n.6 (8th Cir. 1996).

treated as lost, even though subsequent deposits are made into the account. Id.

WLS argues that the lowest intermediate balance rule is inconsistent with South Dakota law because it conflicts with the state law which defines damages for conversion as "[t]he value of the property at the time of the conversion, with the interest from that time. . . ." S.D. Codified Laws § 21-3-3(1) (Michie 1988 & Supp. 1996). This statute requires that damages be measured from the time of conversion, and the lowest intermediate balance rule allows a claimant to trace otherwise unreachable proceeds at the time of conversion by creating a presumption that its funds were the last proceeds spent from a commingled account. The lowest intermediate balance rule is a tool to permit the calculation of damages at the time of conversion. It does not contradict the statute.

The following chart summarizes the evidence presented at trial about the funds which moved through the account in early February:

| Date | IBP sale deposits in feedlot account | Total Balance in feedlot account |
|---|---|---|
| 2/1/94 | $152,000.00 | $381,675.92 |
| 2/4/94 | $27,510.12 | -($191,298.77) |
| 2/8/94 | $31,000.00 | $211,893.43 |
| 2/9/94 | ----- | -(648,462.33) |
| 2/11/94 | $6,008.18 | Account placed on hold with final balance of $27,846.81 |

Applying the lowest intermediate balance rule to this case, the only proceeds from WLS cattle in the account at the time it was

closed were the $6008.18 deposited on February 11. Three of the four checks representing IBP's payment for cattle had been deposited in the feedlot's account before February 9, 1994. On that date the account was overdrawn in the amount of $648,462.33, and there were no proceeds in it which WLS could trace to its cattle. Funds were then paid out to parties other than the bank on or before February 9. The last check from IBP for $6008.18 was deposited in the account on February 11, and the balance did not drop below that amount between the time of the deposit and the time the account was closed. This $6008.18 is the only part of the proceeds that WLS is able to demonstrate an ownership or possessory interest in at the time of the alleged conversion. Even considering all the evidence in favor of WLS, there is no evidence from which a reasonable jury could conclude that WLS had an interest in the account at the time of the alleged conversion that exceeded $6008.18.

Because WLS never took measures to protect its interest in the proceeds, this case is factually different from South Cent. Livestock Dealers, Inc. v. Security State Bank of Hedley, Tex., 614 F.2d 1056 (5th Cir. 1980). In South Central the plaintiff's funds were specifically earmarked in a separate custodial account designed for individual feedlot customers. Id. at 1058. There was no need to trace funds because the plaintiff's interest in the account was already established.[3] Here, tracing is required because WLS is trying to demonstrate an ownership interest in the feedlot's general account that was used for its everyday operations. WLS could have taken measures to protect or segregate its interest in the cattle by a purchase money security interest in the cattle or

---

[3]Rensch v. Riddle's Diamonds of Rapid City, Inc., 393 N.W.2d 269 (S.D. 1986), cited by WLS, is also distinguishable and does not provide authority to show WLS had a possessory interest in the funds in the feedlot's account.

a separate account or legal relationship with the feedlot, but it did not.

WLS also argues that the bank's bad faith undermined its security interest in the feedlot account and that therefore the bank did not have a legal interest in the funds. In an action for conversion a claimant must recover on the strength of its own interest in the property, without regard to the weakness of the adversary. See 89 C.J.S. Trover & Conversion § 74 (1955 & Supp. 1996); see, e.g., Merchants-Produce Bank v. Mack Trucks, Inc., 411 F.2d 1174, 1177 (8th Cir. 1969)(applying Missouri law); Jerry Harmon Motors, Inc. v. First Nat'l Bank & Trust Co., 472 N.W.2d 748, 755 (N.D. 1991); Napoleon Livestock Auction, Inc. v. Rohrich, 406 N.W.2d 346, 352-53 (N.D. 1987); Allen v. Dealer Assistance, Inc., 299 N.W.2d 744, 747 (Neb. 1980). In order for the bank's behavior to be relevant, WLS must first demonstrate that it had a property interest in the funds seized by the bank on February 11, 1994. Since it was unable to show such an interest in the additional $210,510.12 it claimed, the bank's conduct is irrelevant in respect to those funds.

For WLS to prevail as to the $6008.18 remaining in the account on February 11, it also had to show that its interest in these proceeds was greater than that of the bank. WLS argues that its rights as an unpaid cash seller are superior to the rights of the bank as a secured creditor because the bank acted in bad faith. See S.D. Codified Laws § 57A-2-403(1) (Michie 1988 & Supp. 1996); Burk v. Emmick, 637 F.2d 1172, 1174 (8th Cir. 1980). Assuming without deciding that WLS correctly states the law, its argument fails because the evidence does not show the bank acted in bad faith.

"Good faith" means "honesty in fact in the conduct or transaction concerned," S.D. Codified Laws § 57A-1-201(19) (Michie

1988 & Supp. 1996), or for merchants "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." S.D. Codified Laws §57A-2-103(1)(b) (1988 & Supp. 1996). The burden is on WLS to show that the bank did not act in good faith. The worst evidence against the bank included testimony that it was aware the feedlot floated checks and that the bank may have ignored signs of the feedlot's precarious financial situation. Poor or unwise management by a lender does not equal bad faith, however.

Actual knowledge that funds belong to a third party can limit a bank's ability to setoff funds in good faith. See Four Circle Co-op v. Kansas State Bank & Trust Co., 771 F.Supp. 1144, 1149 (D.Kan. 1991). The bank here did not have knowledge about the specific transactions between WLS and the feedlot. Its general knowledge that the account was used for the feedlot's business transactions is not enough to charge it with bad faith. Otherwise, a bank would be liable every time it exercised rights under a setoff agreement.

This case is also factually different from Iola State Bank v. Bolan, 679 P.2d 720 (Kan. 1984), relied on by WLS. In Iola, the defendant bank was found to have acted in bad faith where there was evidence it had intentionally waited for proceeds to be deposited in the disputed account before exercising its right of setoff. Here, on the other hand, the bank froze and set off the account only after it realized its collateral was insufficient, at a point when the account held a meager amount of funds, and after a series of several substantial overdrafts by the feedlot.

Even considering the evidence in the light most favorable to WLS, there is not sufficient evidence to support a conclusion that the bank acted in bad faith and that its interest in the proceeds was inferior to that of WLS. WLS failed to demonstrate that its

interest in the remaining $6008.18 was superior to the bank's, and it therefore failed on the second element of conversion.  There is no part of the proceeds from the IBP sales that a reasonable jury could have concluded was converted by the bank.[4]

For these reasons the judgment is reversed, and the case is remanded for entry of judgment in favor of the bank.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

_____

[4]This determination makes it unnecessary to consider the bank's argument that specific jury instructions were incorrect or the arguments of WLS on its cross appeal that the instructions improperly limited the amount of its recovery.