**SECURITY STATE BANK, SHELDON, IOWA, Plaintiff,**

**v.**

**FIRSTAR BANK MILWAUKEE, N.A., Defendant.**

**No. C 96–4052–MWB.**

United States District Court, N.D. Iowa, Western Division.

May 23, 1997.

Thomas J. Whorley, Keith G. Thompson, Wolff, Whorley, DeHooge & Thompson, Sheldon, IA, for Plaintiff.

Thomas L. Shriner, Jr., James M. Caragher, G. Michael Halfenger, Andrew J. Wronski, Foley & Lardner, Milwaukee, WI, Jeffrey L. Poulson, Corbett, Anderson, Corbett, Poulson, Flom & Vellinga, Sioux City, IA, for Defendant.

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

BENNETT, District Judge.

### TABLE OF CONTENTS

I. INTRODUCTION ............................................. 1238

II.  STANDARDS FOR SUMMARY JUDGMENT ..............................1239

III. FACTUAL BACKGROUND .........................................1240
     A.  Undisputed Facts ................................................1240
     B.  Disputed Facts ..................................................1242

IV.  LEGAL ANALYSIS ..............................................1243
     A.  Arguments Of The Parties........................................1243
     B.  The Lowest Intermediate Balance Rule .............................1244
         1.  Applicability and terms of the LIBR .............................1244
         2.  Application of the rule ..........................................1246

V.   CONCLUSION ...................................................1248

When John Morken's Adventure Cattle investment scheme collapsed, it left virtually no one associated with it without some sort of grievance, spawning litigation in numerous federal and state courts. In this lawsuit, one of Morken's creditors, a bank, has brought claims against another bank, the one that provided account services to Morken and a corporation he controlled, for alleged conversion, wrongful setoff, unjust enrichment, and establishment of a constructive trust. At issue are the proceeds from the sale of some of Morken's cattle in which the creditor bank claims a security interest. After those proceeds passed into one of the accounts of the corporation Morken controlled, the servicing bank dishonored checks on a related disbursement account. The creditor bank alleges that, by dishonoring those checks, the servicing bank converted and setoff funds in which the creditor bank had a superior interest. The servicing bank asserts that it is entitled to summary judgment, because the funds in question had been dissipated from the account in question by Morken before any checks were dishonored. Therefore, the court is called upon to probe the mysterious workings of the "lowest intermediate balance rule" to see if the creditor bank can generate a jury question that proceeds in which it had a security interest can be traced into, but not out of, the account in question, and if so, whether the servicing bank's conduct in dishonoring checks resulted in a conversion or wrongful setoff of those proceeds.

## I. INTRODUCTION

Plaintiff Security State Bank of Sheldon, Iowa (SSB), filed the original complaint in this matter on May 31, 1996, against Firstar

Corporation, Firstar Bank Wausau, N.A., and Firstar Bank Milwaukee, N.A. SSB filed an amended complaint on February 14, 1997, naming only Firstar Bank Milwaukee, N.A. (Firstar Milwaukee), as a defendant. Count I of the amended complaint alleges "Wrongful Dishonor, Set–Off and Conversation [sic]." Amended Complaint, Count I. Count II alleges "Unjust Enrichment and Constructive Trust." *Id.*, Count II. The essence of the claims is that Firstar Milwaukee, in concert with an affiliate bank, received a deposit of proceeds from the sale of cattle in which SSB had a security interest, but then dishonored checks representing those proceeds, which SSB had applied to John Morken's promissory note with SSB. Dishonoring the checks, SSB alleges, was a wrongful conversion of the funds and wrongful setoff of the funds against debts of Morken and his corporation, Spring Grove Livestock Exchange, Inc. (SGLE), even though SSB had a superior interest in the funds.

Firstar Milwaukee answered the amended complaint on February 18, 1997. That same day, Firstar Milwaukee also moved for summary judgment. Firstar Milwaukee asserts that it is entitled to summary judgment, because SSB lost its security interest in the cattle at the time of their sale to a third party, and lost its security interest in any proceeds of the cattle when those proceeds were dissipated by Morken and SGLE from SGLE's account with Firstar Milwaukee before Firstar Milwaukee ever dishonored the checks SSB had applied to Morken's debt. SSB eventually resisted the motion for summary judgment on March 24, 1997. Firstar Milwaukee filed a reply brief on April 4,

1997. Neither party requested oral arguments on the dispositive motion. Consequently, Firstar Milwaukee's motion for summary judgment is ready for disposition.

The court will review the standards for summary judgment as well as the undisputed and disputed facts identified by the parties, then turn to a legal analysis of such of the issues raised by the parties as the court finds are determinative of the motion for summary judgment.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini*, 900 F.2d at 1238 (quoting *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555); *Hartnagel v. Norman*, 953 F.2d 394, 396 (8th Cir.1992).

The standard for granting summary judgment is well established. Rule 56 of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(b)–(c) (emphasis added); *see also Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Reliance Ins. Co. v. Shenandoah S., Inc.*, 81 F.3d 789, 791 (8th Cir.1996); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir.1995); *Munz v. Michael*, 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S. S. Great Lakes Fleet, Inc.*, 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone*, 993 F.2d 1328, 1331 (8th Cir. 1993); *Woodsmith Publ'g Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini*, 900 F.2d at 1238 (citing *Fed. R.Civ.P.* 56(c)).[1] A court considering a motion for summary judgment must view all the facts in the light most favorable to the non-moving party, here SSB, and give SSB the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir.1996); *Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1280 (8th Cir.1996); *Marts v. Xerox, Inc.*, 77 F.3d 1109, 1112 (8th Cir.1996); *Munz*, 28 F.3d at 796; *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.*, 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene*, 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield*, 939 F.2d 666, 667 (8th Cir.1991), *cert. denied*, 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

---

1. An issue of material fact is genuine if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394.

Procedurally, the moving party, here Firstar Milwaukee, bears "the initial responsibility of informing the district court of the basis for [its] motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53); *see also Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir.1993). Firstar Milwaukee is not required by Rule 56 to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

"When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. SSB is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach*, 49 F.3d at 1325. Although "direct proof is not required to create a jury question, . . . to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Prods., Inc. v. Herrick*, 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison*, 28 F.3d at 66.

In *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11, *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53, and *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Quick*, 90 F.3d at 1376–77; *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel*, 953 F.2d at 396 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). If SSB fails to make a sufficient showing of an essential element of a claim with respect to which it has the burden of proof, then Firstar Milwaukee is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552; *Woodsmith*, 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Burk*, 948 F.2d at 492; *Woodsmith*, 904 F.2d at 1247.

With these standards in mind, the court turns to consideration, first, of the pertinent undisputed and disputed facts that form the backdrop to SSB's claims and Firstar Milwaukee's assertion that summary disposition of SSB's claims is appropriate.

### III. FACTUAL BACKGROUND

#### A. Undisputed Facts

Plaintiff SSB is an Iowa banking corporation with its principal office in Sheldon, Iowa. It is engaged in the business of operating and conducting general banking services, but it is also a sophisticated agricultural lender. Among SSB's borrowers were John D. and Dorothy Morken. The Morkens were in the business of feeding cattle. SSB extended to the Morkens a revolving line of credit, eventually with a limit of $1.2 million, for the purchase of feeder cattle. The line of credit was secured by the Morkens' livestock and farm products. The Morkens also owned and operated Spring Grove Livestock Exchange, Inc. (SGLE), which was an independent enterprise in the business of buying and selling cattle on its own account.

John Morken drew on the line of credit from SSB to purchase cattle from Willberg Cattle Company, which he divided into four lots and put on feed at a feedlot near Sheldon, Iowa. The lots of cattle in question here were designated S–218, S–219, W–2, and N–254. SSB claims a first priority purchase money security interest in these four lots of cattle. The cattle were first fattened, then ultimately sold to Monfort, Inc., a meatpacker with a plant in Des Moines, Iowa, either through SGLE as an agent of Morken or through an intermediate sale of the cattle by Morken to SGLE.

Both the Morkens and SGLE maintained accounts with various Firstar banks. Firstar Milwaukee, the specific Firstar bank that is a defendant in this action, is a national banking corporation with its principal place of business in Milwaukee, Wisconsin. SGLE had established a "controlled disbursement system" through Firstar Milwaukee and its affiliates. A controlled disbursement system, Firstar Milwaukee asserts and SSB does not dispute, is a standard cash management device that allows a customer to maximize its investment income and minimize the amount of deposits it must maintain in a low– or non-interest bearing checking account by enabling the customer to determine the precise balance required to cover checks presented for payment on its checking account on any banking day. Using such a system, excess balances can be maintained in interest–bearing instruments or accounts.

The specific account in this controlled disbursement system that is at the center of this lawsuit is a corporate depository account, # 112921293, that SGLE maintained with defendant Firstar Milwaukee. This account is described by the parties as the "Funding Account" or "Depository Account," and was used as SGLE's general operating account. Items made payable to SGLE were received in a lockbox at Firstar Milwaukee, then endorsed by Firstar Milwaukee personnel, as authorized by SGLE, and deposited in the Funding Account. All of SGLE's deposits were credited to this Funding Account, which was designed to function only as a depository account against which checks typi-

cally were not drawn. Instead, SGLE's disbursements were made from a "Disbursement Account," # 164785, at another affiliate, Firstar Wausau.

The Disbursement Account was designed to maintain only a nominal "imprest" balance of $25,000. Thus, on each banking day, debits were posted to the Disbursement Account, simultaneous ledger credits were posted to the Disbursement Account in the amount of the items presented for payment that day, and the Funding Account was simultaneously debited a corresponding amount. The result of these transactions was that the debits and credits to the Disbursement Account netted out at zero at the end of each banking day, and the Disbursement Account maintained its "imprest" balance of $25,000. All debits for items presented for payment to the Disbursement Account were ultimately reflected in the Funding Account. When a check on the Disbursement Account was dishonored, the Disbursement Account was credited in the amount of the item dishonored, but simultaneously debited in the same amount to maintain the "imprest" balance. The Funding Account received a simultaneous credit in the amount of the item dishonored on the Disbursement Account. SGLE's true ledger balance was therefore reflected in the Funding Account at the end of every banking day.

Returning to the sale of the cattle in which SSB claims a security interest, the ultimate buyer of the cattle, Monfort, Inc., issued five checks payable to SGLE in payment for the cattle. Those checks were deposited in the Funding Account on May 9, 11, 12, 13, and 16, 1994.[2] The Monfort checks were commingled in the Funding Account with SGLE's other receipts credited during the same time period. SGLE wrote checks on the Disbursement Account to third parties against these and other deposits to the Funding Account, all of which were honored. By May 25, 1994, SGLE had overdrawn the Funding Account by $647,425.21.

On May 31, 1994, SGLE drew four checks on the Disbursement Account payable to John Morken as payment for the four lots of

---

**2.** The checks were numbered 210536, 210676, 210786, 120889, and 210939, respectively.

cattle sold to Monfort. SSB endorsed those checks and applied them against Morken's outstanding balance on his line of credit. When the checks were presented for collection, however, Firstar Milwaukee, as agent for Firstar Wausau, the bank at which the Disbursement Account was actually held, dishonored the checks for insufficient funds. Firstar Milwaukee asserts that the reason the checks were dishonored is that it had discovered that Morken and SGLE had been manipulating the controlled disbursement system in order to perpetrate a massive check-kiting scheme. In response, Firstar Milwaukee and the other Firstar banks dishonored all checks presented for payment against the SGLE Disbursement Account and Morken's personal account on or after June 1, 1994. Morken and SGLE subsequently filed for bankruptcy protection.

SSB contends that the dishonor of the checks from SGLE to Morken, which SSB had credited against the outstanding balance on Morken's line of credit, constituted conversion and wrongful setoff of proceeds of the cattle in which SSB had a security interest superior to Firstar Milwaukee's interest.

### B. Disputed Facts

SSB asserts several issues of fact preclude the entry of summary judgment in this case. Firstar counters that SSB has not adequately substantiated these facts, because SSB has failed to designate any portion of the record supporting any of them. Firstar also contends that even if adequately substantiated, these "facts" do not require denial of Firstar's summary judgment motion. Therefore, questions concerning the disputed facts involve not only whether they are "genuine," *Hartnagel*, 953 F.2d at 394 (explaining that an issue of material fact is genuine if it has a real basis in the record, citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)), but whether they are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.");

*Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394. The court will resolve these questions as necessary below. For now, the court will simply survey the facts SSB asserts are material to its claims and genuinely in dispute.

SSB asserts that there is a genuine issue of material fact as to whether or not it held a perfected, priority security interest in the proceeds from the sale of the cattle in lots W–A, N–254, S–218, and S–219 and whether that security interest persisted after the proceeds were deposited in the SGLE Funding Account. SSB also contends that the controlled disbursement system used by SGLE, involving accounts at two separate institutions, was established by Firstar Milwaukee for the purpose of speeding up collection of funds while slowing down disbursement of funds. SSB also contends that there is a genuine issue of material fact as to whether the separate Funding and Disbursement accounts were treated by Firstar Milwaukee as, and in reality were, one account.

Firstar Milwaukee contends that there was no way for it to know of the source of Morken's or SGLE's individual deposits, the purpose of their individual debits, or the existence of SSB's alleged security interest in either cattle or proceeds. In response, SSB contends that there is a genuine issue of material fact as to whether Firstar Milwaukee was aware that Morken was borrowing money from SSB for the purpose of purchasing cattle, and aware of SSB's perfected security interest in cattle and proceeds of those cattle. SSB also contends that there is a factual dispute as to whether Firstar "swept" all funds in the SGLE accounts and transferred those funds to a different account when it learned that John Morken daily wrote checks to and from SGLE in amounts totaling as much as $20 million a day. SSB contends that the "sweep" of the accounts left no funds available to pay the checks that represented the proceeds of Morken's cattle sales, which Morken had used to pay part of his line of credit with SSB.

Prior to sweeping the accounts, SSB contends that Firstar Milwaukee had honored all overdrafts of SGLE and Morken in the SGLE accounts and Morken's personal ac-

count, including all overdrafts during the month of May, 1994. SSB contends further that the funds representing the proceeds of the cattle were used to cover, in part, overdrafts in SGLE accounts during the month of May, 1994. SSB contends that it is also pertinent that the bankruptcy trustee for SGLE's bankruptcy estate has never sought to recover the proceeds from the sale of the four lots of cattle that SSB is now attempting to recover.

## IV. LEGAL ANALYSIS

### A. Arguments Of The Parties

As grounds for summary judgment in its favor on SSB's claims, Firstar Milwaukee asserts that SSB's security interest in Morken's cattle was terminated under the federal Food Security Act, 7 U.S.C. § 1631, and a pertinent provision of Iowa's version of the Uniform Commercial Code (UCC), Iowa Code § 554.9307(4), both of which provide that a buyer of farm products takes free of a security interest created by the debtor seller except under certain conditions. Firstar Milwaukee next contends that SSB's security interest, if any, in the proceeds of the cattle was terminated after those proceeds were commingled in SGLE's Funding Account. This argument has two prongs. First, Firstar Milwaukee contends that Iowa Code § 554.9306(4) limits a secured party's security interest in the cash proceeds of an insolvent debtor to proceeds received by the debtor ten days prior to the debtor's bankruptcy petition. Firstar Milwaukee contends that the proceeds in question here were received more than ten days prior to SGLE's petition in bankruptcy. The second prong of this argument is that the Iowa common-law "lowest intermediate balance rule," incorporated into the Iowa Commercial Code via Iowa Code § 554.1103, establishes that the commingled funds are no longer traceable or identifiable as proceeds of Morken's cattle sales, because SGLE's account had a negative balance between the time the funds were deposited and the time SSB contends the wrongful conversion or setoff occurred.

SSB counters that there is no basis in either statutory or common law for Firstar Milwaukee's assertion that SSB's security interest in the proceeds of Morken's cattle sales terminated prior to the date of the alleged wrongful conversion and setoff. First, SSB contends that neither the federal Food Security Act nor Iowa Code § 554.9307(4) terminated its security interest in the *proceeds* of Morken's cattle sales. Those statutes, SSB contends, could terminate only its security interest in the *cattle,* while Iowa Code § 554.9306(2) specifically continues SSB's security interest in the proceeds notwithstanding the sale of the collateral. SSB next contends that Firstar Milwaukee has not alleged nor shown that SSB waived its security interest in the proceeds through an established course of dealing. SSB contends further that the proceeds of the cattle sales remained traceable after those proceeds were commingled in SGLE's Funding Account. SSB argues that Firstar Milwaukee has failed to establish that it is a debtor entitled to the protections of Iowa Code § 554.9306(4), because Firstar Milwaukee cannot bootstrap its interest to that of SGLE. Finally, SSB asserts that the continuous debit balance of the SGLE accounts, apparently treating SGLE's line of credit, Disbursement, and Funding Accounts as a single account, establishes the inapplicability of the lowest intermediate balance rule. SSB's argument is based primarily on *C & H Farm Serv. v. Farmers Sav. Bank,* 449 N.W.2d 866, 877 (Iowa 1989), which SSB characterizes as holding that the lowest intermediate balance rule is inapplicable where a bank honors overdrafts, then attempts to set off the funds advanced against subsequently deposited funds.

In its reply brief, Firstar Milwaukee explains its argument that the sale of the cattle cut off SSB's security interest in either cattle or proceeds. Firstar Milwaukee argues that the proceeds of Morken's cattle sales were not the funds eventually deposited in SGLE's funding account, but were instead SGLE's promise to pay Morken. Firstar Milwaukee argues that, because SGLE took the cattle free of SSB's security interest under the Food Security Act and Iowa law, the proceeds SGLE received from the sale of those cattle must also have been free of SSB's security interest. Firstar Mil-

waukee then reiterates that, even if SGLE's deposits of the Monfort checks to the Funding Account were deposits of proceeds of the sale of SSB's collateral, Iowa Code § 554.9306(4) would terminate any security interest in those proceeds, not because Firstar Milwaukee is a "debtor," but because SGLE was a debtor who declared bankruptcy. Firstar Milwaukee next takes issue with SSB's attempts to show that the "true balance" of the Funding Account was something other than what Firstar Milwaukee has shown it to be. Instead, Firstar Milwaukee asserts that SSB "miscomprehends" how the Funding Account and line of credit worked, asserting that Morken, not Firstar Milwaukee, determined when the credit line should be used to advance funds to the Funding Account and when the Funding Account should be drawn against to pay down the outstanding balance on the credit line. Thus, Firstar Milwaukee contends, it was not Firstar Milwaukee that advanced funds to cover any overdrafts in the Funding Account. SSB's arguments to the contrary, Firstar Milwaukee contends, are part of SSB's attempt "to shove the square facts of this case into the round hole created by the Iowa Supreme Court's decision in *C & H Farm Serv. v. Farmers Savings Bank*, 449 N.W.2d 866 (Iowa 1989)." Firstar Bank Milwaukee, N.A.'s Reply Memorandum In Support Of Its Motion For Summary Judgment (hereinafter, Firstar Milwaukee's Reply Brief), at 14. SSB's interpretation of the *C & H Farm Serv.* case, Firstar Milwaukee says, is too broad, and in any event that decision says only that a bank could not set off proceeds deposited after an overdraft occurred, but the decision applied the lowest intermediate balance rule prior to the overdraft. Firstar Milwaukee points out that the proceeds in this case were deposited before an overdraft occurred. Firstar Milwaukee therefore contends that even under *C & H Farm Serv.*, the lowest intermediate balance rule applies to the alleged proceeds, and establishes that those proceeds were dissipated before any alleged setoff or conversion occurred.

Although the court has surveyed all of the principal arguments of the parties, the court finds that it need only address the last ditch arguments asserted by each party. Those arguments concern the applicability and effect of the lowest intermediate balance rule. Assuming, as each of the parties does, that SSB could prevail on all of the preliminary arguments concerning the existence of its security interest in the Monfort checks deposited by SGLE in the Funding Account, the court finds that SSB still has failed to generate any genuine issues of material fact or legal arguments that the lowest intermediate balance rule does not require summary judgment in Firstar Milwaukee's favor.

### B. The Lowest Intermediate Balance Rule

#### 1. Applicability and terms of the LIBR

Iowa Code § 554.1103 provides for the supplementation of rules of law stated in Iowa's version of the UCC with principles drawn from the common law:

> Unless displaced by the particular provisions of this chapter, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

Iowa Code § 554.1103. The Iowa Supreme Court has made recourse to the lowest intermediate balance rule (LIBR) to trace proceeds of a creditor's collateral in commingled accounts. *See, e.g., C & H Farm Serv.*, 449 N.W.2d at 877.

The Iowa Supreme Court has explained the LIBR as follows:

> Under this rule, a secured creditor is entitled to the full amount of the proceeds of its collateral deposited to a commingled fluid account if the balance of the account remains at all times equal to or greater than that amount; but if the account balance is at any time reduced below the amount of the deposited proceeds, the creditor cannot recover more than the lowest balance in the account even though deposits thereafter increase the balance of the account.

*C & H Farm Serv.*, 449 N.W.2d at 877. The Iowa Supreme Court found that interpretations of "identifiable proceeds" under Iowa Code § 554.9306 were consistent with the LIBR. *Id.* The court noted that Iowa Code § 554.9306 is identical to UCC § 9–306. *Id.* at 876. Thus, Comment 2(c) to UCC § 9–306 was instructive. *Id.* That Comment states:

Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. What has been said relates to payments and transfers in the ordinary course.

UCC § 9–306, Comment 2(c); *C & H Farm Serv.*, 449 N.W.2d at 876 (quoting this Comment). The court then reiterated its conclusion in a prior decision applying the statute:

The fact that the proceeds were commingled with other funds of the debtor does not defeat this priority by making them unidentifiable. *The proceeds are identifiable in their entirety within the meaning of the statute because the account balance always exceeded the amount of the proceeds during the period involved.*

*C & H Farm Serv.*, 449 N.W.2d at 877 (quoting *Coachmen Indus., Inc. v. Security Trust & Sav. Bank of Shenandoah*, 329 N.W.2d 648, 650 (Iowa 1983), with emphasis supplied by the *C & H Farm Serv.* court).

Federal circuit courts of appeals, including our own, have also supplemented the rules of the UCC with the common-law LIBR. In a very recent decision that also involved attempts to trace proceeds of cattle sales commingled with other funds in a debtor's bank account, the Eighth Circuit Court of Appeals found that, under South Dakota law, " '[t]racing is an equitable principle which allows a party with the right to property to trace that property through any number of transactions in order to reach the final proceeds or result.' " *Meyer v. Norwest Bank Iowa*, 112 F.3d 946, 950 (8th Cir.1997). The tracing rule the court found was applicable was the LIBR, which the Eighth Circuit Court of Appeals explained as follows:

Under the lowest intermediate balance rule, it is assumed the traced proceeds are the last funds withdrawn from a contested account. *In re Columbia [Gas Sys., Inc.]*, 997 F.2d [1039,] 1063 [ (3d Cir.1993), *cert. denied sub nom. Official Committee of Unsecured Creditors of Columbia Gas Transmission Corp. v. Columbia Gas Transmission Corp.*, 510 U.S. 1110, 114 S.Ct. 1050, 127 L.Ed.2d 372 (1994) ]. Once the traced proceeds are withdrawn, however, they are treated as lost, even though subsequent deposits are made into the account. *Id.*

*Meyer*, 112 F.3d at 951.

Similarly, the Fourth Circuit Court of Appeals noted that "[i]n tracing and identifying proceeds under Article 9 of the U.C.C., courts have utilized the 'lowest intermediate balance rule.' " *Sony Corp. v. Bank One, W. Va., Huntington, N.A.*, 85 F.3d 131, 138 (4th Cir.1996) (citing, *inter alia, C & H Farm Serv. Co. of Iowa v. Farmers Sav. Bank*, 449 N.W.2d 866 (Iowa 1989)). The explanation of the LIBR by the Fourth Circuit Court of Appeals is also comparable to the ones given by the Iowa Supreme Court and the court of appeals of this circuit:

This rule has been defined as follows:

The rule, which operates on a common-sense view that dollars are fungible and cannot practically be earmarked in an account, provides a presumption that proceeds remain in the account as long as the account balance is equal to or greater than the amount of the proceeds deposited. The proceeds are "identified" by presuming that they remain in the account even if other funds are paid out of the account.... Under the rule, however, if the balance of the account dips below the amount of deposited proceeds, [the prior] security interest in the identifiable proceeds abates accordingly. This lower balance is not increased if, later, other funds of the debtor are deposited in the account.

*C.O. Funk & Sons, Inc. v. Sullivan Equipment, Inc.*, 89 Ill.2d 27, 59 Ill.Dec. 85, 87, 431 N.E.2d 370, 372 (1982). The lowest intermediate balance rule assumes that "the debtor spends his own money out of the account before he spends the funds encumbered by the security interest." *Ex*

*parte Alabama Mobile Homes, Inc.,* 468 So.2d 156, 160 (Ala.1985). Furthermore, funds that are not spent but transferred to other accounts or used to purchase investments are identifiable as proceeds of the collateral. *Central Production Credit Ass'n v. Hans,* 189 Ill.App.3d 889, 137 Ill. Dec. 302, 311–12, 545 N.E.2d 1063, 1072–74 (1989) (funds in checking account were identifiable proceeds even though the funds had been used to purchase investments, which were then sold and redeposited into the checking account). Thus, the rule preserves the proceeds to the greatest extent possible as the account is depleted. *C.O. Funk & Sons,* 59 Ill.Dec. at 87, 431 N.E.2d at 372.

*Sony Corp.,* 85 F.3d at 138–39; *accord City of Farrell v. Sharon Steel Corp.,* 41 F.3d 92, 102–03 (3d Cir.1994) (applying the LIBR to trust fund taxes collected by a Chapter 11 debtor prepetition and describing the rule as "a judicial construct that some federal courts have applied to ease a beneficiary's tracing burden when 'a trustee commingles trust funds with other monies in a single account,'" and describing the function of the rule as "'allow[ing] trust beneficiaries to assume that trust funds are withdrawn last from a commingled account. Once trust money is removed, however, it is not replenished by subsequent deposits. Therefore, the lowest intermediate balance in a commingled account represents trust funds that have never been dissipated and which are reasonably identifiable,'" quoting *Columbia Gas,* 997 F.2d at 1063).

The workings of the LIBR might be understood by visualizing proceeds in which some person has a security interest as "sinking to the bottom" of the commingled account into which those proceeds are deposited. All debits to the commingled account are considered to be "skimmed" off the top of the commingled account. Thus, only when the level of funds in the account sinks so low that disbursements must dip into the proceeds, sitting at the bottom of the account, are those proceeds dissipated. The proceeds can be dissipated completely or only partly, depending on how low the account balance sinks. However, when new funds are poured into the commingled account, those new funds do not replenish the proceeds already dissipated, even though they replenish the account to a level above the full sum of the proceeds originally deposited. The portion of proceeds dipped out of the account is simply gone and cannot be replenished.

### 2. *Application of the rule*

In *Meyer,* the Eighth Circuit Court of Appeals applied the LIBR to circumstances comparable in many ways to those presented here. A livestock sales barn sued a bank for conversion based on the bank's dishonor of two checks to the sales barn written by a feedlot that maintained accounts at the defendant bank. *Meyer,* 112 F.3d at 948–49. The defendant bank, a secured creditor of the feedlot, did not honor the checks, because it had closed the feedlot's account under a setoff agreement with the feedlot. *Id.* The bank had extended the feedlot a line of credit, maintained by a security interest in its cattle and other collateral. *Id.* The feedlot also maintained a demand deposit checking account with the bank, the terms of which gave the bank the right to setoff any amounts the feedlot owed the bank. *Id.* The feedlot regularly commingled proceeds from different cattle sales in this account and used the account to pay operating expenses. *Id.* The bank closed the feedlot's account when it became concerned about the sufficiency of the feedlot's collateral. *Id.*

However, prior to the closure of the account, the feedlot had incurred obligations to the sales barn that was the plaintiff in the action. *Id.* The feedlot gave the sales barn a check for cattle it had purchased, and, pursuant to the usual practice of those two parties, the sales barn waited a week before presenting the check for payment, by which time, the bank had closed the account. *Id.* The sales barn argued that its ability to trace proceeds from the cattle sales into the feedlot's account prior to the date the bank closed the account demonstrated that the bank had converted those funds when it closed the account. *Id.* at 950–51. The bank argued that the funds were no longer in the account by the time it took the action alleged to constitute conversion of those funds, its closing of the account. *Id.*

The Eighth Circuit Court of Appeals found that three of four checks allegedly representing proceeds of the cattle sold to the feed lot, checks from a meatpacker to the feedlot, were deposited before the date the debtor's account became overdrawn. *Id.* at 951–52. Thus, the proceeds represented by those three checks were no longer in the account at the time the bank closed the account. *Id.* Only a fourth check from the sale of the cattle to the meatpacker was deposited after the date of the overdraft, and the balance of the account did not drop below the amount of that check between the time it was deposited and the time the account was closed. *Id.* Thus, the court held that only a sum equivalent to the amount of the fourth check was proceeds of the cattle sales remaining in the account at the time of the alleged conversion, and that sum was all the "proceeds" in the commingled account in which the sales barn could demonstrate an ownership or possessory interest. *Id.*

The application of the LIBR in *Meyer* is consistent with Firstar Milwaukee's argument that all proceeds in which SSB could possibly claim a security interest were dissipated when SGLE's Funding Account was overdrawn on May 25, 1994. *Id.* (three checks deposited before the date the account became overdrawn were dissipated and could not be reached by the secured party on the grounds of a setoff allegedly occurring later than the date of the overdraft). Although the account was subsequently replenished, there was no further deposit of any proceeds in which SSB could claim a security interest between the date of the overdraft and the date of the allegedly wrongful conversion or setoff. *Cf. id.* (a fourth check, deposited after the date of the overdraft had not been dissipated as of the date of the allegedly wrongful conversion and setoff, because the account balance had never dipped below the amount of that check after it was deposited). However, SSB argues that this case fits within the special circumstances and special rules of *C & H Farm Serv.*, 449 N.W.2d at 877, not the general rule or circumstances of cases like *Meyer*.

In *C & H Farm Serv.*, the Iowa Supreme Court found that a bank accused of a wrongful conversion and setoff had paid checks overdrawing a debtor's account out of the bank's own funds, and the bank thereby became a creditor of the debtor. *C & H Farm Serv.*, 449 N.W.2d at 875–76. The court concluded as follows:

> [A] secured party's right to proceeds of collateral deposited to the debtor's bank account is superior to the bank's right to a setoff of the same proceeds against amounts the debtor owes the bank. In other words, the bank may not loan money to [the debtor] by paying [the debtor's] overdrafts and then expect to "jump over" [another secured party's] priority in identifiable proceeds of [the secured party's] collateral. The bank is liable for conversion of [the secured party's] collateral to that extent.

*Id.* at 876–77. SSB contends that the Funding Account was often overdrawn and Firstar Milwaukee paid SGLE's overdrafts from its own funds; therefore, Firstar Milwaukee cannot "jump over" SSB's security interest in the proceeds of the cattle sales. In response, Firstar Milwaukee contends that it did not cover any of SGLE's overdrafts out of its own funds. Instead, those overdrafts were covered by deposits to SGLE's Funding Account of funds from other sources and by transfers of funds from Morken's existing line of credit on Morken's instructions. Firstar Milwaukee asserts, and SSB has presented no contrary evidence on this summary judgment record, that Morken, not Firstar Milwaukee, determined when his credit line should be accessed to cover debits to the Funding Account that overdrew the Funding Account.

The court finds that SSB had failed to generate a genuine issue of material fact as to whether overdrafts in the Funding Account were covered by Firstar Milwaukee from its own funds, and thus has failed to generate a genuine issue of material fact that this case comes within the special rule of *C & H Farm Service*. The nonmovant must designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach*, 49

F.3d at 1325. If SSB fails to make a sufficient showing of an essential element of a claim with respect to which it has the burden of proof, then Firstar Milwaukee is "entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552; *Woodsmith,* 904 F.2d at 1247. In the court's opinion, even though funds from Morken's line of credit are undeniably Firstar Milwaukee's own funds, those funds had already been advanced to Morken pursuant to an entirely separate agreement. If those funds were applied to the overdraft in the SGLE account pursuant to Morken's instructions, not on Firstar Milwaukee's initiative, the source of the funds should not be considered as any different from the source of any other funds used to replenish the Funding Account. SSB has generated no genuine issue of material fact that Firstar Milwaukee, instead of Morken, determined that funds from Morken's line of credit should be used to service overdrafts in the Funding Account.

However, the court's determination that Firstar Milwaukee is entitled to summary judgment does not rest solely on this conclusion. In *C & H Farm Serv.,* the Iowa Supreme Court also concluded as follows:

> To the extent that the bank paid [the debtor's] checks to other creditors at times when [the debtor's] checking account carried a positive, or credit balance, we agree with the bank. The lowest intermediate balance rule alluded to in *Coachmen Industries* would apply. Because the account was overdrawn by the time [the secured party] claimed its balance as proceeds of collateral, all of the proceeds had been paid out and none remained to be identified in the hands of the bank.

*Id.* at 877. Firstar Milwaukee contends that the Iowa Supreme Court's application of the LIBR to the circumstances specified in this part of the decision in *C & H Farm Serv.* means that the LIBR is applicable here. Firstar Milwaukee argues that the record facts show that the proceeds in which SSB claims a security interest were dissipated during periods when the Funding Account had a positive balance, that is, before the date on which SGLE's overdraft in the Funding Account occurred. Because the account

was overdrawn before SSB claimed its proceeds, and no proceeds were deposited between the date of the overdraft and the date of the alleged setoff, Firstar Milwaukee contends that the LIBR is applicable to all of the funds SSB claims as proceeds. *Id.* Applying that rule, Firstar Milwaukee asserts, all of the proceeds had been paid out and none remained to be identified in the hands of the bank by the date of the overdraft, let alone by the date of the alleged conversion and setoff. *Id.*

■ The court agrees with Firstar Milwaukee's statement of the facts and analysis of the effect of *C & H Farm Serv.* in light of those facts. First, SSB has generated no dispute of fact that its alleged proceeds were not deposited and dissipated during a period when the Funding Account had a positive balance. *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. Second, as a matter of law, funds deposited and dissipated within a period when the account in question had a positive balance are subject to the LIBR. *C & H Farm Serv.,* 449 N.W.2d at 877. The date of the overdraft alluded to, May 25, 1994, simply identifies the cut-off date for any period in which proceeds could still be subject to the LIBR. *Meyer,* 112 F.3d at 951–52. There is absolutely no record evidence that any alleged proceeds were deposited after the date of that overdraft. The overdraft occurred prior to the date of any alleged conversion or setoff by Firstar Milwaukee. Therefore, by the time of that alleged conversion and setoff, any proceeds in which SSB could claim a security interest had already been dissipated. *C & H Farm Serv.,* 449 N.W.2d at 877. ·

## V. CONCLUSION

Firstar Milwaukee is entitled to summary judgment, because, even assuming SSB had a security interest in proceeds deposited to the SGLE Funding Account, on the record evidence and application of the LIBR to that evidence, SSB's asserted proceeds were dissipated and the Funding Account was overdrawn prior to any alleged conversion or setoff of the proceeds by Firstar Milwaukee.

No additional proceeds were deposited after the date the Funding Account was overdrawn, such that it is irrelevant whether the overdraft was covered from Firstar Milwaukee's own funds or from some other source.

Firstar Milwaukee's motion for summary judgment is therefore **granted** and this matter is **dismissed**.

**IT IS SO ORDERED.**